REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0784

September Term, 2016

STATE OF MARYLAND

v.

JAMAL RASHEED SIZER

Graeff,
Leahy,
Moylan, Charles E., Jr.
   (Senior Judge, Specially Assigned),

                                             JJ.

Opinion by Moylan, J.
Concurring Opinion by Graeff, J.

Filed:  November 29, 2016

The wisdom undergirding this State appeal emanates from the twenty-eighth chapter of the Book of Proverbs, Verse 1:

> "The wicked flee when no man pursueth;
>   but the righteous are bold as a lion."

And the Book of Proverbs begat Terry v. Ohio. And Terry v. Ohio begat the indictment of the appellee, Jamal Rasheed Sizer, by the Grand Jury for Howard County. When the appellee fled, Officer Andrew Schlossnagle pursued, leading to the appellee's being charged with the unlawful possession of a firearm with a nexus to drug trafficking. On December 4, 2015, the appellee filed a pre-trial motion to suppress evidence taken from his person, alleging a Fourth Amendment violation. A hearing was held on that motion on May 26, 2016, at the close of which the motion was granted.

## The State Appeal

The State filed a timely appeal on June 3, 2016. The appeal is authorized by Maryland Code, Courts and Judicial Proceedings Article, § 12-302(c)(4). Pertinent are subsections (c)(4)(iii) and (iv):

> "(iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.

> "(iv) Except in a homicide case, if the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken. In that case, the State may not prosecute the defendant on those specific charges or on any other related charges arising out of the same incident."

(Emphasis supplied).

The record was filed with this Court on August 3, 2016. Accordingly, our decision must be rendered no later than December 1, 2016. We heard oral argument on November 2, 2016.

## Standard of Appellate Review

In <u>Longshore v. State</u>, 399 Md. 486, 498-99, 924 A.2d 1129 (2007), the Court of Appeals summarized definitively the standards governing the appellate review of a decision to suppress evidence. That standard first delineates the evidence and argument subject to review:

> "When an appellate court reviews a trial court's grant or denial of a motion to suppress evidence under the Fourth Amendment, <u>it will consider only the facts and information contained in the record of the suppression hearing</u>."

399 Md. at 498. (Emphasis supplied). That limitation is easy to adhere to in the present case, because there is nothing else to consider.

The standard then makes clear the deference the appellate court will extend to the fact-finding of the hearing judge:

> "Moreover, when there is a conflict in the evidence, <u>an appellate court will give great deference to a hearing judge's determination and weighing of first-level findings of fact</u>. It will not disturb either the determinations or the weight given to them, unless they are shown to be clearly erroneous."

<u>Id</u>. (Emphasis supplied). In this case, the hearing judge made extensive findings of fact, which we will recount in full detail.

2

The standard also states that when there is a conflict between the respective versions of the evidence presented by the State and by the defense, the tilt on appellate review will go decisively in favor of the prevailing party:

> "An appellate court further will view the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the party prevailing on the motion[.]"

Id.

In this case, the prevailing party was the appellee. In any conflict between competing versions of the evidence, therefore, it would be the appellee's version that we will accept as historic fact. In this particular case, however, that potentially favorable tilt is for the appellee an essentially empty victory. He has offered no significant[1] alternative version of the evidence toward which we might tilt. He did not testify. He essentially presented no evidence on his own behalf. His counsel, before the hearing judge, did not even argue any contrary interpretation of the evidence. The State's evidence was effectively unchallenged.

Once the evidence has been presented, however, and once the hearing judge has made possible findings of fact, there remains the ultimate issue of determining the legal significance of the accepted facts. On this legal issue, the appellate court will make its own de novo determination:

---

[1] On a peripheral issue not critical to the State's case, there was a slight ambiguity in the testimony of Officer Schlossnagle. Did the appellee's declaration, "I have a pistol" occur an instant before the officer touched the appellee or was it contemporaneous with the touching? We will resolve that ambiguity in favor of the appellee, who was the prevailing party at the suppression hearing.

> "An appellate court, however, under an independent <u>de novo</u> review standard, must consider the application of the law to those facts in determining whether the evidence at issue was obtained in violation of the law, and, accordingly, should be suppressed."

399 Md. at 499. See also, <u>State v. Nieves</u>, 383 Md. 573, 581-82, 861 A.2d 62 (2004); <u>Laney v. State</u>, 379 Md. 522, 533-34, 842 A.2d 773 (2004); <u>Dashiell v. State</u>, 374 Md. 85, 93-94, 821 A.2d 372 (2003); <u>Stokeling v. State</u>, 189 Md. App. 653, 661-62, 985 A.2d 175, <u>cert</u>. denied, 414 Md. 332, 995 A.2d 297 (2010).[2] We will announce our <u>de novo</u> determination <u>infra</u>.

### The Initial Encounter

Officer Andrew Schlossnagel and Corporal James Zammillo testified for the State. Officer Ronald Baker was briefly called by the appellee, but his testimony coincided 100% with that of the other officers. There were no other witnesses. With respect to their testimony, the hearing judge made the following assessment of their credibility:

> "The police testified today without embellishment. <u>The Court found them to be truthful and credible</u>."

(Emphasis supplied).

On the afternoon of November 20, 2015, at approximately 5:30 p.m., the three testifying officers, along with two other officers, were on bike patrol near the Owen Brown Village Center. They were all members of the Pathway Patrol Unit, informally known as the Bike Unit. The officers described the general character and reputation of the area. They

---

[2] For a final fine-tuning of the standard, see <u>Morris v. State</u>, 153 Md. App. 480, 487-90, 837 A.2d 248, <u>cert</u>. denied, 380 Md. 618, 846 A.2d 402 (2004); <u>Charity v. State</u>, 132 Md. App. 598, 606, 753 A.2d 556, <u>cert</u>. denied, 360 Md. 487, 759 A.2d 231 (2000).

referred to the Owen Brown Village Center and its surrounding footpaths as a "high crime area." Corporal Zammillo, the supervisor of the Pathway Patrol Unit, testified that the Owen Brown Village area is such a high crime area that a police satellite office was established nearby to keep close control of it. The witnesses recounted how, on the night before November 20, there had been reports of a person brandishing a handgun on the footpaths around the Village Center. Because of such criminal activity, the officers had been asked by local business owners to increase their presence in the area. With respect to the responsibilities of the bike patrol and with respect to the characterization of the neighborhood as a "high crime area," the hearing judge made the following specific findings of fact.

> "[T]heir duty is to patrol the pathways of Columbia to ensure safety of the public. That the night before, there had been a complaint made of someone brandishing or displaying a handgun in the parking lot of the Owen Brown Cradlerock Library, and there was, understandably, concern. <u>In general, the area is considered a high or higher-crime area in Columbia. There had been a number of robberies, and the police had certainly this mind-set and were certainly doing what they were supposed to be doing, that is, patrolling the area</u>."

(Emphasis supplied).

At 5:30 p.m. in November, the parking lot area was largely dark. The approaching officers observed between five and seven persons standing around a mini-van in the parking lot. The group was loud and appeared to be "passing an alcoholic beverage back and forth." One unidentified member of the group threw a glass bottle on the ground. Officer Baker, moreover, recognized one member of the group, a Joseph Davis, as a "repeat offender" who was banned from the Village Center. The hearing judge made specific

5

factfindings with respect to the police observations of the group milling about the mini-van.

> "They're in a darker, less lit area. They see this group of individuals which includes the Defendant, Mr. Sizer. That the group appears to be loitering; that the group appears to be drinking alcohol, open containers, and that somebody of the group – they cannot be sure whether it was Mr. Sizer or not – threw a bottle. <u>The police were concerned, understandably, and approached the group</u>. They were in uniform. On their bright-blue jackets are their respective names and the word "Police," and they verbally identified themselves as police. <u>While they themselves had been in a darker area, the testimony was that there was sufficient lighting in the parking lot area to see the group</u>."

(Emphasis supplied).

## Unprovoked Flight

As the group of officers approached the group of civilians, they announced their official presence by saying, "Police. Stop. Don't run." They were in uniform, bright-blue jackets with the word "Police" in prominent letters. At that point, the appellee "turned and immediately began sprinting away." Officer Schlossnagle along with Officer Burris took off in immediate pursuit, repeatedly giving "multiple commands to stop running." Because Officers Schlossnagel and Burris were on bikes and the appellee was on foot, the pursuit was brief. As the two officers caught up with the appellee and were about to "take him down," the appellee threw up his hands and yelled, "Okay, I have a pistol. I have a pistol." The officers wrestled the appellee to the ground and started to place him in handcuffs.

## The Arrest as a Superseding Rationale

It was at that point, seconds after Officer Schlossnagle first caught the appellee and while Officer Schlossnagle and Officer Burris were still attempting to handcuff him, that Corporal Zammillo arrived on the scene. As the supervisor of the unit, Corporal Zammillo

6

had seen the two officers begin the chase and he, on bike, set off only seconds behind them. Corporal Zammillo immediately recognized the appellee as someone with whom he had had multiple prior interactions. Of critical importance, Corporal Zammillo also knew, from his check of the Police Department's Records Management System, that the appellee had an active arrest warrant issued by the Howard County Sheriff's Department. Corporal Zammillo knew the appellee by face and name. Knowing well many of the characters in a particular high crime area, Corporal Zammillo explained that, each day just before setting out with his unit to patrol a particular area, he would look over the list for those with outstanding warrants for their arrest. The appellee had outstanding arrest warrants for both the distribution of marijuana and for the violation of probation.

Corporal Zammillo arrived on the "take down" scene just as Officers Schlossnagle and Burris were wrestling the appellee to the ground and were in the process of handcuffing him. Corporal Zammillo informed the appellee that there was an outstanding warrant for his arrest and arrested him. As of the moment of that arrest, a fresh and superseding Fourth Amendment rationale took control of the case, and the propriety vel non of the preceding Terry stop became immaterial with respect to events that followed. As he was being arrested, the appellee announced to the officers, "I have a piece and pills on me."

### The Frisk and the Search Incident

During his brief flight, the appellee had been wearing a backpack. As he fell to the ground, the backpack fell with him. As soon as the handcuffs were on the appellee, the officers looked in the backpack and immediately observed a .38 caliber revolver, along

7

with the appellee's I.D. Because a potentially hostile crowd was gathering, the officers immediately took the appellee and his backpack and adjourned to the nearby police satellite office.

At the satellite office, the officers removed from the backpack the .38 caliber revolver, loaded with five rounds of ammunition. Also recovered were four additional rounds of ammunition. A further search at the satellite office produced from the appellee's sock a baggie containing 27 pills. At that point, it but remained to draw a proper legal conclusion from this unchallenged evidentiary predicate.

### The Suppression Ruling

Although the hearing judge's factfinding was unvaryingly supportive of the reasonableness of the police behavior through every step of the confrontation, the court's legal ruling turned abruptly in an opposite direction. As we examine <u>de novo</u> where the legal analysis that lead to the suppression of the evidence went, in our <u>de novo</u> judgment, astray, that analysis seemed to insist that a <u>Terry</u> stop must be based on nothing short of the <u>per se</u> illegality of the suspect's behavior. The hearing court's analysis began:

> "The issue before the Court is, when Mr. Sizer ran, <u>was it reasonable for the police to run after him</u>? One could argue that it was, because why is this guy running? But <u>[Defense Counsel] points out, and he's right</u>, that <u>flight, in and of itself</u>, or not sticking around for the police to investigate you <u>in and of itself is not illegal</u>."

(Emphasis supplied).

Reliance on the fact that flight is not, in and of itself, illegal sets an unduly high bar for a <u>Terry</u> stop to clear. A reasonable articulable suspicion that a crime has occurred, is

8

then occurring, or is about to occur does not demand evidence legally sufficient to sustain a criminal conviction. Nor does it demand so much as probable cause. In <u>Butler v. State</u>, 214 Md. App. 635, 651, 78 A.3d 887 (2013), this Court succinctly set out the appropriate quantitative measure:

> "[R]easonable suspicion <u>requires 'more than a mere hunch but is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence</u>.""""

(Emphasis supplied; citation omitted). <u>See</u> <u>also</u> <u>Holt v. State</u>, 435 Md. 443, 459-60, 78 A.3d 415 (2013); <u>Crosby v. State</u>, 408 Md. 490, 506, 970 A.2d 894 (2009); <u>Nathan v. State</u>, 370 Md. 648, 660, 805 A.2d 1086 (2002); <u>Cartnail v. State</u>, 359 Md. 272, 285, 753 A.2d 519 (2000).

In <u>United States v. Arvizu</u>, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), the Supreme Court commented on the same easily satisfied quantitative standard for a constitutional <u>Terry</u> stop:

> "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, <u>the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard</u>[.]"

(Emphasis supplied; citations omitted). <u>See</u> <u>also</u> <u>Adams v. Williams</u>, 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape."); <u>Alabama v. White</u>, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); <u>United</u>

States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d. 1 (1989); United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

As we shall point out infra, flight in and of itself may not be illegal per se, but it may well be a constitutional justification for an investigative detention, to wit, a Terry stop, pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

As the court's analysis then went on to invalidate what could have been a Terry frisk for weapons, it suggested that a police officer's fear that a suspect might be armed and dangerous would be rendered unreasonable if there were an unrebutted possibility that the suspect might have a license for the gun he was carrying.

> "So, the police take Mr. Sizer down, and Mr. Sizer says, in the process of Officer Schlossnagle taking him down – says, I have basically a weapon. And there's no per se illegality of having a weapon. I'm assuming that the Defendant didn't have a permit, but I don't know that, to carry. And so it's not per se illegal to have a weapon."

(Emphasis supplied).

The hearing court's analysis there goes astray because it fails to appreciate that a Terry frisk is not predicated on the illegality of the suspect's behavior in possessing a handgun but on the very different predicate of an officer's fear for his own safety when confronting a suspect who the officer reasonably believes may be armed or dangerous. A suspect with a licensed handgun is just as dangerously armed as is a suspect with an unlicensed handgun. Licensed handguns shoot bullets that are just as deadly as are those from unlicensed handguns. A permit to carry a handgun would no more vitiate the need for a frisk than would the suspect's promise not to shoot anybody with it. Even if the stopee

10

had his permit to carry a handgun pinned to the front of his shirt and even if the officer read it before conducting the frisk, that would in no way eliminate or even diminish the need for the frisk. Indeed, it would enhance the need. Per se illegality is simply not a requirement for the reasonable articulable suspicion to support a Terry frisk.

As the hearing court's analysis concluded, it seemed to reaffirm the quintessential reasonableness of Officer Schlossnagle's conduct even as it grudgingly held that "the rules were not followed."

> "Officer Schlossnagle most likely, probably did – in addition to Officer Baker and Corporal Zammillo – probably saved the public potentially from additional crimes that evening; one could argue that. Probably did…. Do I have any doubt that the Defendant ran because he didn't want to be arrested, because he had, probably, an illegal weapon on his person; that he was on probation, and that in and of itself most likely precluded him from having any weapons on his person? Am I reasonably sure that he had illegal drugs on his person? Of course I am. I wasn't born yesterday. But that's not the issue. The issue is, were all the rules followed? And although I can understand the heat of the moment, I can understand the high-crime area, the fact that Mr. Sizer ran, in and of itself, based on the particular scenario that's being given here today, is not sufficient."

(Emphasis supplied).

The hearing court referred to "Officer Schlossnagle's act of physically putting his hands on the Defendant and, in the officer's words, taking him down." Lest there be any suggestion there that a "hard take down" might render an otherwise good Terry stop unreasonable, see In re David S., 367 Md. 523, 539, 789 A.2d 607 (2002):

> "Several police officers conducted a 'hard take down' of respondent. The officers, with their weapons drawn, forced respondent to the ground and placed him in handcuffs. This conduct was not unreasonable because the officers reasonably could have suspected that that respondent posed a threat to their safety. Considering the totality of the circumstances, as they appeared

11

to the officers at the time, in order to maintain their safety, <u>handcuffing respondent and placing him on the ground for a brief time was reasonable</u> and did not convert the investigatory stop into an arrest under the Fourth Amendment. <u>Although this is a severe form of intrusion</u>, we conclude that under the circumstances, <u>it was reasonable</u>."

(Emphasis supplied). <u>See also</u>, <u>Lee v. State</u>, 311 Md. 642, 661-66, 537 A.2d 235 (1988); <u>Elliot v. State</u>, 417 Md. 413, 429-30, 10 A.3d 761 (2010); <u>Bailey v. State</u>, 412 Md. 349, 371-72 n. 8, 987 A.2d 72 (2010); <u>Chase v. State</u>, 224 Md. App. 631, 646-47, 121 A.3d 257, <u>aff'd</u>, 449 Md. 283, 144 A.3d 360 (2015).

## Unprovoked Flight as a Dispositive <u>Terry</u> Factor

Our <u>de novo</u> determination is that the constitutional protocols were scrupulously observed. The Fourth Amendment was not offended, and the evidence should not have been suppressed. The reasonable articulable suspicion for the <u>Terry</u> stop, moreover, was by no means based merely on flight. It was far more multi-factored than that. It was based on <u>unprovoked</u> flight <u>upon the approach of the police in a high crime area</u>. This case was a paradigmatic replay of <u>Illinois v. Wardlow</u>, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) itself.

In <u>Wardlow</u>, even as in in the present case, a team of eight officers converged on a Chicago neighborhood known for being a high crime area, specifically "an area known for heavy narcotics trafficking." Wardlow, theretofore unknown to the police, was standing next to a building, holding an opaque bag. Wardlow, as did the appellee here, looked in the direction of the officers, then turned, and inexplicably fled. Two officers, as in this case, took off in pursuit. A short distance away, Officer Nolan stopped Wardlow and

immediately conducted a pat-down search for weapons. As part of the frisk, Officer Nolan squeezed the opaque bag Wardlow was carrying and felt a heavy, hard object similar in shape to a gun. He opened the bag and recovered a loaded .38 caliber handgun. Wardlow was then arrested. 582 U.S. at 121-22.

The issue in <u>Wardlow</u>, as in the case now before us, was whether, pursuant to <u>Terry v. Ohio</u>, the police had reasonable suspicion to justify the initial detention of the suspect based on his flight. The trial court denied Wardlow's motion to suppress the evidence. The Illinois Appellate Court, however, reversed the conviction, holding that Officer Nolan did not have reasonable suspicion to justify a <u>Terry</u> stop. 287 Ill. App. 3d. 367, 678 N.E.2d 65 (1997). The Illinois Supreme Court affirmed. 183 Ill. 2d 306, 701 N.E.2d 484 (1998). On certiorari, the United States Supreme Court reversed the Illinois courts and held that the <u>Terry</u> stop was, indeed, constitutional.

Prominent among the factors that the Supreme Court found to be strongly supportive of the reasonableness of the <u>Terry</u> stop was the character of the neighborhood as a high crime area.

> "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. <u>Brown v. Texas</u>, 443 U.S. 47, 99 S. Ct. 2637, 61 L.Ed.2d 357 (1979). But <u>officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation</u>. Accordingly, <u>we have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations</u> in a <u>Terry</u> analysis. <u>Adams v. Williams</u>, 407 U.S. 143, 144, 147–148, 92 S. Ct. 1921, 32 L.Ed.2d 612 (1972)."

528 U.S. at 124. (Emphasis supplied). <u>See</u> <u>also</u>, <u>Stokes v. State</u>, 362 Md. 407, 415-16, 765

A.2d 612 (2001); <u>Anderson v. State</u>, 282 Md. 701, 707 n. 5, 387 A.2d 281 (1978).

When the character of the high crime area is then combined with unprovoked flight

upon noticing the arrival of the police, critical mass has been reached:

> "In this case, moreover, <u>it was not merely respondent's presence in an</u>
> <u>area of heavy narcotics trafficking that aroused the officers' suspicion, but</u>
> <u>his unprovoked flight upon noticing the police</u>. Our cases have also
> recognized that nervous, evasive behavior is a pertinent factor in determining
> reasonable suspicion. <u>Headlong flight</u> – wherever it occurs – <u>is the</u>
> <u>consummate act of evasion</u>: <u>It is not necessarily indicative of wrongdoing,</u>
> <u>but it is certainly suggestive of such</u>."

<u>Id</u>. (Emphasis supplied; internal citations omitted).

Defense counsel doggedly insisted at the suppression hearing in this case that a

citizen has a right to refuse to cooperate and is entitled "to go about one's business." The

Supreme Court articulately responded to just such an argument.

> "<u>[U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its</u>
> <u>very nature, is not 'going about one's business'; in fact, it is just the opposite.</u>
> Allowing officers confronted with such flight to stop the fugitive and
> investigate further is quite consistent with the individual's right to go about
> his business or to stay put and remain silent in the fact of police questioning."

528 U.S. at 125. (Emphasis supplied).

Wardlow himself argued, just as the hearing judge ruled in this case, that there may

be an innocent explanation for flight. The Supreme Court explained that even innocent

behavior may nonetheless be suspicious and, under <u>Terry</u>, may be cognizably suspicious:

> "Respondent and <u>amici</u> also argue that there are innocent reasons for
> flight from police and that, therefore, <u>flight is not necessarily indicative of</u>
> <u>ongoing criminal activity. This fact is undoubtedly true, but does not</u>
> <u>establish a violation of the Fourth Amendment</u>. Even in <u>Terry</u>, the conduct

14

justifying the stop was ambiguous and susceptible of an innocent explanation. The officer observed two individuals pacing back and forth in front of a store, peering into the window and periodically conferring. 392 U.S., at 5–6, 88 S. Ct. 1868. All of this conduct was by itself lawful, but it also suggested that the individuals were casing the store for a planned robbery. Terry recognized that the officers could detain the individuals to resolve the ambiguity. Id., at 30, 88 S. Ct. 1868.

"In allowing such detentions, Terry accepts the risk that officers may stop innocent people. Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent."

528 U.S. at 125-26. (Emphasis supplied).

In Bost v. State, 406 Md. 341, 358, 958 A.2d 356 (2008), the Court of Appeals, albeit dealing primarily with the Uniform Act on Fresh Pursuit, cited Illinois v. Wardlow ("The United States Supreme Court has made clear that unprovoked flight is enough to support reasonable suspicion that a crime has been committed.") and quoted at great length from it. In affirming the police in stopping a suspect in that case, the Court of Appeals set out precisely the same factors that justify the Terry stop in the present case.

"Appellant was seen by the police in a high crime, drug trafficking area. Appellant fled from the police and the flight was unprovoked. The nature of the area is a factor in assessing reasonable suspicion."

406 Md. at 359-60. (Emphasis supplied). See also, Collins v. State, 376 Md. 359, 373, 829 A.2d 992 (2003); Price v. State, 227 Md. 28, 33, 175 A.2d 11 (1961).

### "A High Crime Area" Diminuendo

In an effort to deflect the impact of Illinois v. Wardlow, the appellee interposes an interesting, if not ultimately persuasive, interpretation of "a high crime area." He posits

that when the police described "a high crime area in Columbia," they were not describing "a high crime area per se," as in the case of Illinois v. Wardlow's south Chicago.[3] In a burst of relativism run rampant, the suggestion seems to be that even a relatively "high crime area" in a generally law-abiding community might actually be less dangerous than would be a relatively "lower crime area" of a more pervasively criminal community. The argument would seem to be that if the police describe "the most dangerous corner in Guilford" or "the meanest block in Homeland," those descriptions should rack up Terry reasonable-suspicion points far less rapidly than would those same descriptions on the Barbary Court of San Francisco or in Hell's Kitchen, New York.

Such parochial fine-tuning, of course, would drain the salutary rule of Illinois v. Wardlow of virtually any precedential potency beyond the streets of south Chicago. Supreme Court opinions, however, do not work that way. They propound general rules capable of national application. They speak, of necessity, in broad and simple language that can be readily understood and readily applied by the average American police officer, be it in south Chicago or in Happy Valley, Minnesota. In describing the circumstances that help to give unprovoked flight its investigative significance, Illinois v. Wardlow is an invaluable contribution to Fourth Amendment law. We will not join in attempting to trivialize it into inconsequentiality.

---

[3] Confining our inquiry to the four corners of the suppression hearing, the record does not demonstrate whether, as a seedbed of crime, Columbia is more or less notorious than south Chicago.

## Particularized and Individualized Suspicion

The appellee, however, seems to be in a state of denial about <u>Illinois v. Wardlow</u>. With respect to the antecedent police observations that occurred before the appellee's unprovoked flight, the appellee suggests that there was "no testimony from the officers providing individualized, objective reasonable suspicion that [the appellee] was involved in those incidents." The appellee may well be right but that is hardly the point. Under such circumstances, the prudent thing for the appellee to have done would have been to stand pat and allow the police suspicion to remain unparticularized and unindividualized. Had he simply stood quietly by, as did his companions, he would have been immune from any police restraint, but a guilty conscience leads to flawed judgment. It was only when the appellee, unwisely, turned and began to flee that he turned the focus onto himself and elevated what had only been non-particularized suspicion into highly particularized and highly individualized suspicion. The very fact of flight evidenced consciousness of guilt. This is the dispositive lesson of <u>Illinois v. Wardlow</u>.

As we seek to apply the rule of <u>Illinois v. Wardlow</u> to the case at hand, the critical focus is on the flight scenario itself, not on the pre-flight circumstances. In terms of the flight scenario, no one other than the appellant tried to run away. The appellee's solo flight, therefore, was by definition both "particularized" and "individualized." In the words of <u>Wardlow</u>, "headlong flight" was "not necessarily indicative of wrongdoing, but it [was] certainly suggestive of such." 528 U.S. at 124. Behavior that is certainly suggestive of wrongdoing is ample justification for a reasonable <u>Terry</u> stop.

17

**Both the Frisk and the Search Incident Were Reasonable**

On the basis of Illinois v. Wardlow, we hold that the unprovoked flight of the appellee from a high crime area upon the arrival of the police constituted reasonable articulable suspicion to support a Terry stop for further investigation. The ensuing search of the backpack for weapons would also qualify as a reasonable Terry frisk, if a superseding justification had not rendered that justification redundant.

The discovery of the .38 caliber revolver as the officers looked into the appellant's backpack was constitutionally unassailable under either of two overlapping Fourth Amendment theories. As the appellee was being stopped, he twice announced, "I have a pistol." That alone would have constituted reasonable articulable suspicion that the appellee was armed. Accordingly, the immediate opening of the backpack would have been constitutionally proper as a Terry frisk. The backpack itself was clearly within the reach, lunge or grasp, to wit, the Chimel perimeter, of the stoppee. Michigan v. Long, 463 U.S. 1032, 1048-49, 103 S. Ct. 3469, 77 L.Ed.2d 1201 (1983). See, Williams v. State, 19 Md. App 204, 213-14, 310 A.2d 593 (1973).

In the seconds before the backpack was opened, however, the Terry frisk rationale was superseded by the search incident to lawful arrest rationale of Chimel v. California, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969). Once again, the backpack itself was clearly within the reach, lunge or grasp, to wit, the Chimel perimeter, of the arrestee. Feaster v. State, 206 Md. App. 202, 230-31, 47 A.3d 1051 (2012). The very purpose of the Terry frisk and one of the two purposes of the search incident to arrest, of course, are one

and the same, the protection of the officer. The search-incident perimeter and the frisk perimeter are accordingly conterminous. The search that produced the .38 caliber revolver was, like Portia's quality of mercy, twice-blest. The search that produced the baggy of pills from the appellee's sock, however, must rely for its justification on the search-incident theory alone. That, however, was all that was necessary.

## A Chase is Not a Fourth Amendment Seizure

In a situation such as this, the constitutional measurement of Fourth Amendment justification for a <u>Terry</u> stop takes place only at the end of a chase, when the police lay hands on a suspect and subject him to actual detention, to wit, a <u>Terry</u> stop. The antecedent chase, until it achieves its purpose, is not yet subject to Fourth Amendment analysis for it is neither a "search" nor a "seizure." It is a case of Fourth Amendment inapplicability and until the Fourth Amendment is applicable, it cannot be violated. <u>California v. Hodari D.</u>, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 l.Ed.2d 690 (1991) held squarely:

> "The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not.

> "The language of the Fourth Amendment, of course, cannot sustain respondent's contention. <u>The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement</u>, even when it is ultimately unsuccessful. ('She seized the purse-snatcher, but he broke out of her grasp.') <u>It does not remotely apply</u>, however, <u>to the prospect of a policeman yelling, 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure</u>."

(Emphasis supplied).

19

Michigan v. Chesternut, 486 U.S. 567, 575, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), spoke to the same effect.

> "Applying the Court's test to the facts of this case, we conclude that respondent was not seized by the police before he discarded the packets containing the controlled substance. Although Officer Peltier referred to the police conduct as a 'chase,' and the Magistrate who originally dismissed the complaint was impressed by this description, the characterization is not enough, standing alone, to implicate Fourth Amendment protections."

(Emphasis supplied; footnote omitted).

County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), was a case in which a high-speed police chase of a motorcycle resulted in the fleeing motorcyclist spinning off the road and being killed. Although the police may have been liable for civil damages, no Fourth Amendment analysis was called for because the Fourth Amendment was simply not involved.

> "The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. No one suggests that there was a search, and our cases foreclose finding a seizure."

523 U.S. at 843. (Emphasis supplied). And see, Brower v. County of Inyo, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). It may be a stingy Fourth Amendment, but it does not proscribe unreasonable chases.

### Terry Stops and Police Use of Force

Because Officer Schlossnagle's physical "take down" of the appellee seems as if it may have been the pivot for the hearing court's decision to suppress the evidence, a brief comment is in order about the police use of force in the course of a Terry stop. A Terry stop, of course, is not a mere accosting between equals. Swift v. State, 393 Md. 139, 149-

20

52, 899 A.2d 867 (2006). Once suspicion has risen above the level of an "inchoate hunch" and ripened into a reasonable, articulable suspicion, the police are constitutionally authorized to detain a suspect and to question him. The suspect, in turn, is lawfully required, within certain limitations as to time and place, to stand still and submit to the questioning. A Terry stop is a lawful exercise of governmental authority, not a mere request that may be disregarded. A suspect who physically resists being detained can be physically restrained. That includes being tackled and/or being handcuffed. For a vivid description of the restraining process of a fleeing suspect, see the Supreme Court's recounting of the process in California v. Hodari D., 499 U.S. 621, 111 S. Ct. 1547, 113 L.Ed.2d 690 (1991). And see, In re David S., 367 Md. 523, 539-40, 789 A.2d 607 (2002); Lee v. State, 311 Md. 642, 667, 537 A.2d 235 (1988). There was no improper use of force in this case. As of the moment the appellee was wrestled to the ground, he was not free to continue running. The officers had the lawful prerogative to "take him down." The evidence should not have been suppressed.

### Independent Source as an Antidote
### To The "Fruit of the Poisonous Tree" Doctrine

The State, moreover, enjoys the benefit of an alternative rationale. Even if, purely arguendo, the Terry stop in this case had been unconstitutional, the .38 caliber revolver taken from the appellee's backpack and the plastic baggie of 27 narcotic pills taken from the appellee's sock should still not have been suppressed. The theory of exclusion urged by the appellee is that those two items of evidence were only procured as a result of the unconstitutional Terry stop, to wit, that they were the "fruit of the poisonous tree."

21

The "Fruit of the Poisonous Tree" Doctrine traces back to <u>Silverthorne Lumber Co.</u> <u>v. United States</u>, 251 U.S. 385, 40 S. Ct. 182, 64 L.Ed. 319 (1920). It deals with the second generation exclusion of indirect or derivative evidence. It was explained by Justice Holmes:

> "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible."

251 U.S. at 392.

In <u>Nardone v. United States</u>, 308 U.S. 338, 60 S. Ct. 266, 84 L.Ed. 307 (1939), it was Justice Frankfurter who first employed the term "derivative evidence" and who coined the felicitous label "fruit of the poisonous tree" doctrine. It was also Justice Frankfurter who first recognized a limitation on the doctrine's reach, as he pointed out that between the original illegality and the ultimate derivative evidence, the "connection may have become so attenuated as to dissipate the taint." 308 U.S. at 341.

Over the course of the next 45 years, the Supreme Court hammered out what are now universally recognized to be three limitations on, or exemptions from, the exclusion of evidence based on the "Fruit of the Poisonous Tree" Doctrine. They are 1) the Attenuation of Taint, 2) Independent Source, and 3) Inevitable Discovery. They each have a different analytic rationale. They each have separate rules of application. Although they all are directed toward the same end, the non-exclusion of evidence, they should not be confused with one another. In <u>Gibson v. State</u>, 138 Md. App. 399, 403, 771 A.3d 536 (2001), this Court looked to the three modes of determining that exclusion was not mandated:

22

"It has come to be recognized that <u>there are three ways of</u> what has colorfully been described as '<u>unpoisoning the fruit</u>.' Less colorfully but more accurately, <u>these are actually three ways of determining that the fruit was not poisoned in the first instance</u>."

(Emphasis supplied).

<u>Gibson</u> first turned its focus on attenuation of taint. That is a theory of non-exclusion based not on the fact that the "fruit" was not poisoned but on the idea that the poison has, through time and circumstances, become so strained and diluted that it is no longer lethal. <u>Gibson</u> explained, 138 Md. App. at 403:

"The first, presaged by Justice Frankfurter in <u>Nardone</u>, is the attenuation of taint. <u>Wong Sun v. United States</u>, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), rejected a 'but for' rule in applying the doctrine and explained that the proper question to be answered with respect to derivative evidence is

'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead <u>by means sufficiently distinguishable to be purged of the primary taint</u>.'

"Tony Amsterdam, <u>Search, Seizure, and Section 2255: A Comment</u>, 112 U. Pa. L.Rev. 378, 390 (1964), pointed out that <u>the underlying purpose of the attenuation test is to mark 'the point of diminishing returns of the deterrence principle</u>.'"

(Emphasis supplied).

Of the three distinct modes of determining that the exclusion of evidence is not called for, let us jump forward to the third and last of those modalities, inevitable discovery, before zeroing in on the one that could, <u>arguendo</u>, be applicable to the case now before us. With respect to inevitable discovery, <u>Gibson</u> observed, 138 Md. App. at 404:

23

"A third way of determining that derivative evidence is not excludable is a finding of 'inevitable discovery.' The lead case on that exemption is Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984):

> "'It is clear that the cases implementing the exclusionary rule "begin with the premise that the challenged evidence is in some sense the product of illegal governmental activity." Of course, this does not end the inquiry. If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.'"

(Emphasis supplied). There but remains to be examined the second species of exemption from exclusion, the Independent Source Doctrine.

### A Pre-Existing Arrest Warrant

However constitutional or unconstitutional the antecedent Terry stop of the appellee in this case may have been, the prior existence of two warrants for the appellee's arrest constituted an independent source for the discovery of the .38 caliber revolver and the plastic baggie of 27 pills taken from the appellee. Corporal Zammillo was aware of the existence of the arrest warrants and he placed the appellee under arrest prior to the police opening of the appellee's backpack. As Gibson surveyed the field, it said with respect to independent source:

> "A second way of determining that evidence is not poisoned fruit, notwithstanding a suspicious "post hoc – propter hoc" time sequence, is when the evidence has proceeded from an independent source. Murray v. United States, 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), explained that the 'independent source' exception applies not
>
> > 'only to evidence obtained for the first time during an independent lawful search,' but 'also to evidence initially

24

> discovered during, or as a consequence of, an unlawful search,
> but later <u>obtained independently from activities untainted by
> the initial illegality</u>.'"

138 Md. App. at 403-404. (Emphasis supplied).

In <u>Segura v. United States</u>, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the police effected an unlawful entry into the defendants' apartment. Once inside, however, they did not search the apartment but merely secured it while other members of the police team, without the benefit of anything observed in the unlawful entry of the apartment proceeded to get a search warrant. Notwithstanding the fact that 19 hours went by before the search warrant was obtained, it was only when the search warrant was executed at the apartment that incriminating evidence was discovered in the course of the search authorized by the warrant. The holding of the Supreme Court was very clear:

> "<u>The illegality of the initial entry</u>, as we will show, <u>has no bearing on the second question</u>. The resolution of this second question requires that we determine whether the initial entry tainted the discovery of the evidence now challenged. On this issue, we hold that <u>the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as 'fruit' of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence</u>[.]"

(Emphasis supplied). The search was pursuant to the search warrant, which had never been tainted. There was no taint to attenuate.

<u>Murray v. United States</u>, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), followed <u>Segura</u> four years later and was completely compatible with it in terms of result. The opinion by Justice Scalia, however, presented a far more cogent conceptualization of

25

independent source than had the Segura opinion. Unlike Segura, the Murray opinion did not wander into random and unnecessary uses of the verb "attenuate." Murray spoke only of "independent source" as a distinct and specific exemption from exclusion and did not use language borrowed from a very different species of exemption, to wit, the attenuation of taint. Justice Scalia denominated independent source as a self-standing doctrine in its own right.

> "Almost simultaneously with our development of the exclusionary rule, in the first quarter of this century, we also announced what has come to be known as the 'independent source' doctrine."

487 U.S. at 537. (Emphasis supplied). The Murray opinion, 487 U.S. at 538, attributes the "original use of the term" independent source to Justice Holmes in Silverthorne, 257 U.S. at 392:

> "[T]his does not mean that all the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others."

(Emphasis supplied).

> Murray, 487 U.S. at 542, goes on to explain:

> "So long as a later, lawful seizure is genuinely independent of an earlier, tainted one … there is no reason why the independent source doctrine should not apply."

The Murray opinion's conceptualization of how the pieces of this body of law fit together dovetails completely with this Court's conceptualization of that same phenomenon in Gibson v. State, supra.[4]

5 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT §11.4(a) 236-37 (3d ed. 1996), contrasts the Independent Source Doctrine with the Attenuation of Taint Doctrine:

> "The 'independent source' test is a paragon of simplicity compared to the 'attenuated connection' formula. As ordinarily applied, it means that if not even the 'but for' test can be met, then clearly the evidence is not a fruit of the prior Fourth Amendment violation. So stated, the 'independent source' limitation upon the taint doctrine is unquestionably sound."

In Williams v. State, 372 Md. 386, 813 A.2d 231 (2002), the Court of Appeals wrote to the same effect:

> "The Silverthorne [Lumber Co. v. United States, 251 U.S. 385, 392, 40 S. Ct. 182, 183, 64 L.Ed. 319 (1920)] Court noted, in dicta, that even if the government obtains knowledge of certain facts in an unlawful manner, as long as knowledge of those facts was derived from a lawful, independent source untainted by the initial illegality, they may be admissible…. The exclusionary rule does not apply when the State learns of the challenged evidence from an independent source."

---

[4] In Robert F. Maguire, How to Unpoison the Fruit – The Fourth Amendment and the Exclusionary Rule, 55 JOURNAL OF CRIMINAL LAW, CRIMINOLOGY, AND POLICE SCIENCE 307, 310 (September 1964), the author notes:

> "One obvious means of eliminating the unlawful search or seizure as a tainting influence is to establish that the proffered evidence was, in fact, discovered as the result not of the unlawful act but rather of information lawfully known to the authorities completely independently of that act. In such a situation one can simply say that the proffered evidence is not the produce of the unlawful act and, hence, is untainted."

372 Md. at 411. Nothing that occurred even in the course of a presumptively tainted Terry stop contributed in any way to the preexisting probable cause that justified the issuance of the warrant for the appellee's arrest. The search incident was the result of that untainted arrest.

In Myers v. State, 165 Md. App. 502, 885 A.2d 920 (2005), the suspect was subjected to a traffic stop on a Pennsylvania highway that was ultimately held to have been an unconstitutional stop. The stopping officer, however, was aware of outstanding warrants for the suspect's arrest and arrested him on the basis of those warrants. The evidence subsequently recovered from the suspect's car was held to be not the suppressible product of the unlawful stop but the legitimate product of a search incident to lawful arrest. The holding of this Court was clear that the arrest on an outstanding warrant was an independent source for the search that followed:

> "In this case before us, there was an illegal stop, but there was a preexisting arrest warrant. The officer did not make the stop for the purpose of enforcing the warrant, and in fact, did not know that the then-unidentified person in the vehicle was subject to an outstanding warrant. … The exclusionary rule does not require suppression of the evidence obtained as a result of the search incident to a valid arrest on an outstanding warrant."

165 Md. App. at 527-28. (Emphasis supplied). There had been strong intimations for such a ruling in Torres v. State, 95 Md. App. 126, 129-33, 619 A.2d 566 (1993) ("The reason for not applying the 'fruit of the poisonous tree' doctrine is that there is a clear break in the chain of cause and effect."); Brown v. State, 124 Md. App. 183, 197-202, 720 A.2d 1270 (1998).

28

On certiorari, the Court of Appeals in its <u>Myers v. State</u>, 395 Md. 251, 909 A.2d 1048 (2006), affirmed the decision of this Court. It held that, notwithstanding the antecedent unconstitutional stop of the suspect, the discovery of an outstanding arrest warrant provided the police with "an independent and intervening reason to arrest and search" the suspect.

> "<u>Once Officer Weikert</u> learned Myers's identity and <u>discovered an outstanding warrant for his arrest, the officer gained an independent and intervening reason to arrest and search Myers</u>. Thus, <u>the subsequent search</u> of Myers and his vehicle <u>was separate and apart from the initial stop</u>. We agree with the Court in [<u>U.S. v.</u>] <u>Green</u>, [111 F.3d 515 (7th Cir. 1997),] that a chance discovery of an outstanding arrest warrant makes a more compelling intervening circumstance than others."

395 Md. at 293. (Emphasis supplied; footnote omitted).

The Court of Appeals reached a similar decision in <u>Cox v. State</u>, 397 Md. 200, 916 A.2d 311 (2007). It did not even have to decide whether the initial stop of the defendant had been illegal; it simply assumed so, <u>arguendo</u>.

> "Assuming, <u>arguendo</u>, that the police encounter constituted an illegal stop, we deem it more appropriate to determine the ultimate question: whether it was proper for the trial court to grant Petitioner's motion to suppress the evidence."

397 Md. at 203-04. The Court's holding was equally straightforward:

> "We shall hold that the police officer's discovery of an outstanding warrant for Petitioner's arrest and <u>Petitioner's arrest</u> pursuant thereto <u>represents an intervening circumstance</u> sufficient to attenuate the taint of what appears to be an illegal stop."

<u>Id.</u> at 204. (Emphasis supplied).

In Utah v. Strieff, — U.S. —, 136 S.Ct. 2056, 195 L.Ed.2d 400 (2016), the defendant Strieff was initially subjected to a presumptively unconstitutional Terry stop. The State of Utah conceded that there was no reasonable suspicion to justify the Terry stop and the Supreme Court analysis proceeded on that assumption. At the outset of the stop, Strieff was asked for and he furnished identification. The stopping officer called that information in to a police dispatcher, who reported back that there was an outstanding warrant for Strieff's arrest for a traffic violation. Strieff was arrested and then searched as an incident of that arrest. The search revealed a baggie of methamphetamine and drug paraphernalia. The trial court refused to suppress the evidence but the Utah Supreme Court ultimately held that the evidence had been unconstitutionally seized. 357 P.3d 532 (2015).

The Supreme Court of the United States reversed the Utah Supreme Court. After making reference to Segura v. United States and the Independent Source Doctrine, the Court held:

> "In this case, the warrant was valid, it predated Officer Fackrell's investigation, and it was entirely unconnected with the stop. And once Officer Fackrell discovered the warrant, he had an obligation to arrest Strieff. 'A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provision.' Officer Fackrell's arrest of Strieff thus was a ministerial act that was independently compelled by the pre-existing warrant. And once Officer Fackrell was authorized to arrest Strieff, it was undisputedly lawful to search Strieff as an incident of his arrest to protect Officer Fackrell's safety."

136 S.Ct. at 2062-63. (Emphasis supplied).

That analysis would apply four-square to the preexisting arrest warrant for the appellee in this case and to the search incident to that lawful arrest that produced the

30

physical evidence. The arrest warrant and arrest pursuant to that warrant was the independent source for the search incident.

### The "But For" Test Is Almost Universally Discredited

The independent source of a pre-existing arrest warrant renders the arguendo assumption of a tainted Terry stop totally irrelevant as the originating cause of the search incident of the backpack that followed the superseding arrest. We no longer need care whether the antecedent Terry stop was tainted or untainted. If, arguendo, tainted, we no longer need care whether that taint was attenuated or unattenuated, because even an unattenuated taint would be irrelevant.

In an effort to stave off that dispositive irrelevance, the appellee interposes a classic "but for" argument. "But for the hypothetically unreasonable Terry stop," the argument goes, "the police would never have been in a position to arrest the appellant and conduct the ensuing search incident at that particular time and at that particular place." "But for the tainted stop, the independent superseding cause could not have superseded at that precise moment."

"But for" arguments, however, have been traditionally and universally rejected by the Supreme Court, by the Court of Appeals, and by this Court. In Hudson v. Michigan, 547 U.S. 586, 592, 126 S. Ct 2159, 165 L.Ed.2d 56 (2006), the Supreme Court was very clear:

> "[E]xclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence. Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression."

31

(Emphasis supplied).

Segura v. United States, supra, was the prototypical case for the Independent Source

Doctrine. Its rejection of a "but-for" test was emphatic.

> "The Court has never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police.' … The illegal entry into petitioners' apartment did not contribute in any way to discovery of the evidence seized under the warrant; it is clear, therefore, that not even the threshold 'but for' requirement was met in this case."

(Emphasis supplied; internal citations omitted).

As early as Wong Sun v. United States, 371 U.S. at 487-8, the Supreme Court noted

that even in the early days of the exclusionary rule, it had declined to

> "hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of police."

See also, United States v. Ceccolini, 435 U.S. 268, 276, 98 S. Ct. 1054, 55 L.Ed.2d 268

(1978).

In Myers v. State, 395 Md. at 294, the Court of Appeals looked beyond an

unreasonable investigative stop and relied upon a superseding lawful arrest.

> "The search based upon that warrant was justified as a search incident to a lawful arrest. Accordingly, to hold otherwise would not further the goal of deterring unlawful police activity, but would result in the application of an unreasonable 'but for' test that was rejected by the Supreme Court in Wong Sun, supra."

(Emphasis supplied).

32

In rejecting a "but for" rationale, this Court has consistently followed suit. In Cox v. State, 194 Md. App. 629, 5 A.3d 730 (2010), the defendant claimed that but for an illegal detention and search, his subsequent incriminating statement would never have been made.

> "He argues that this statement was the 'fruit' of illegal police conduct, asserting that his arrest was based on the gun found pursuant to the illegal detention and search, and absent his 'unlawful arrest, he would never have been in a position to talk to [a fellow detainee]."

194 Md. App. at 653. Writing for this Court, Judge Graeff roundly rejected reliance on a "but for" rationale.

> "For evidence to be excluded under the 'fruit of the poisonous tree' doctrine, 'there must be a "cause-and-effect" relationship or nexus between the poisonous tree and it's alleged fruit.' Evidence is not considered to be 'fruit of the poisonous tree,' however, merely because it would not have been discovered 'but for the illegal actions of the police. Wong Sun, 371 U.S. at 488, 83 S. Ct. 407. … Accord United States v. Ceccolini, 435 U.S. 268, 276, 98 S. Ct. 1054, 55 L.Ed.2d 268 (1978) ('we have declined to adopt a "per se or 'but for' rule" that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest."").

194 Md. App. at 655-56. (Emphasis supplied; some internal citations and quotations omitted).

As early as Baker v. State, 39 Md. App. 133, 383 A.2d 696 (1975), this Court has rejected a "but for" test. In Baker, 39 Md. App. at 136-37, the defendant relied upon his admittedly illegal arrest to urge a "but for" rejection of everything that followed from it.

> "Appellant, however, contends that his illegal arrest precludes any identification of him, so that he should in no way be connected with the offense and must be freed. The argument advanced by appellant may be styled as the 'but for' approach. 'But for' the illegal arrest he would not have been caught and, ergo, could not have been identified as the culprit."

(Emphasis supplied).

Quoting with approval from <u>Commonwealth v. Garvin</u>, 448 Pa. 258, 264, 293 A.2d 33 (1972), this Court rejected "but for" analysis.

> "<u>No law abiding society could tolerate a presumption that but for the illegal arrest the suspect would never have been required to face his accusors</u>. Thus, we conclude that the only effect of the illegal arrest was to hasten the inevitable confrontation and not to influence its outcome."

39 Md. App. at 142. (Emphasis supplied).

In <u>Gibson v. State</u>, 138 Md. App. at 410-11, this Court pointed out how sweepingly destructive a blight a "but for" exclusionary approach would inflict.

> "At oral argument, however, and somewhat tentatively, the appellant championed a more virulent strain of the 'fruit of the poisonous tree' doctrine that, if ever loosed upon the law, would not contaminate a piece of fruit or two in a single orchard but would blight and level entire forests. <u>He argues that **BUT FOR** their stopping of him on November 11, the police would never have learned 1) his identity, 2) his lengthy history of burglary and his parole status in New York, and 3) the fact that he lived a few blocks away from the scene of the January 27 crime</u>. He argues further that **<u>BUT FOR</u>** <u>that information, they would have had no occasion to be parked across the street from his home</u> during the early morning hours of February 12 and February 14 in a position to make the observations they did after he left his house. <u>He argues finally that those observations are excludable 'fruits of the poisonous tree</u>.'"

(Emphasis supplied).

We pointed out how the derivative evidence might be admissible under the Attenuation of Taint Doctrine or might be admissible under the Independent Source Doctrine, but would in no event be suppressible under a "but for" rationale.

> "Even assuming, <u>arguendo</u>, that the stop on November 11 was bad (we are not remotely suggesting that it was), that would not operate to bar

34

from evidence or from other uses the police observations of February 12 and February 14.

"The admissibility of the observations would be clear whether considered as an instance of the attenuation of the initial taint, Wong Sun v. United States; United States v. Ceccolini, or as the product of an independent source, Segura v. United States; Murray v. United States."

138 Md. App. at 412. (Emphasis supplied).[5]

## A Cautionary Analytic Note[6]

Although the bottom line decision of Utah v. Strieff, to wit, that the evidence produced by the search incident to Strieff's lawful arrest would not be suppressed, is unquestionably correct, the Strieff analysis is at times uncomfortably shaky. There seems to be a growing trend in the more recent caselaw generally to utilize the same analytic approach that Streiff at times seems to employ. As the concurring opinion confirms, there is a growing trend to utilize this analytic approach and that is the reason for this cautionary note. The bottom-line result of non-suppression is not threatened by this trend because the shaky analysis and a more solid analysis both push in the same direction, toward non-exclusion. What is threatened, however, is a cogent overview and understanding of this entire body of law. The result is fine, but the analysis is muddled. It is in a muddle, moreover, that seems to be rapidly metastasizing.

---

[5] The case of Missouri v. Grayson, 336 S.W.3d 138, 147 (2011), cited by the concurring opinion is a classic example of the application of a "but for" rationale.

[6] With respect to this final section of the opinion, "A Cautionary Analytic Note" and "Conclusion," Judge Moylan is writing for himself alone and not for the panel.

The culprit is a promiscuous overuse and misuse of the verb "to attenuate" and an almost robotic misapplication of criteria from the "Attenuation of Taint Doctrine" to other doctrines, such as "Independent Source" and "Inevitable Discovery," where those criteria are not at all pertinent. The word "attenuate" is being misused to refer to any reason not to suppress evidence whereas it should properly be used to refer to only one of three possible reasons not to suppress. The body of law that we need to conceptualize is the "Fruit of the Poisonous Tree Doctrine." Beginning with Silverthorne Lumber Company in 1920, that doctrine explained why, following unconstitutional investigative behavior by the police, the exclusion of secondary derivative evidence is a necessary deterrent to police misbehavior, just as surely as is the exclusion of primary or direct evidence.

Beginning with Wong Sun v. United States in 1963 and Brown v. Illinois in 1975, the law recognized a set of circumstances calling for exemption from such exclusion of evidence. The first such exemption to be recognized was what has come to be called the Attenuation of Taint Doctrine. In determining whether the exclusion of evidence is appropriate or not, that doctrine examines the chain of cause-and-effect between the cause (the tainted police behavior) and the effect (the recovery of evidence). Brown v. Illinois itself, 422 U.S. at 602, speaks of "the causal chain between the illegal arrest and the statements made subsequent thereto." Where the causation is close and certain, exclusion is appropriate. Where, on the other hand, the chain of causation is, by time or other circumstances, long drawn out or attenuated, exclusion may not be appropriate. This is why the criteria for measuring what has happened along that chain of cause-and-effect includes

36

such <u>Brown v. Illinois</u> considerations as 1) temporal proximity, 2) intervening circumstances, and 3) purpose and flagrancy of the official misconduct. Those criteria are measures of attenuation between the original taint and the ultimate evidence. After a certain point, the original causation loses its potency, so that the exclusion of evidence is a case of overkill. To get a proper conceptualization of what the Attenuation of Taint Doctrine is all about, one should carefully follow, step by step, the protracted and oft-interrupted chain of causation that was before the Supreme Court in <u>Wong Sun v. United States</u>. It is a prime example of what attenuation means.

To picture the field as it has developed, it may be helpful to think of a genus and its relationship to its constituent species. The broad genus we are dealing with is Exemption from Exclusion. That genus now embraces three distinct species: 1) the Attenuation of Taint Doctrine, 2) the Independent Source Doctrine, and 3) the Inevitable Discovery Doctrine. When <u>Brown v. Illinois</u> was written in 1975, however, attenuation of taint was the only exemption from exclusion that had been recognized. The species and the genus, therefore, were one and the same. There was no difference between speaking specifically about attenuation and speaking generically about the whole field of exemption. That, of course, is why present day reliance on language from <u>Brown v. Illinois</u> can be treacherous. It may describe a specific problem in inappropriately generic terms. <u>Brown</u> describes one species of exemption, but it does not describe the entire genus of exemption. As of 1975, however, <u>Brown v. Illinois</u> had yet no way of knowing that, because only one species existed. The other two had not yet been recognized.

With Segura v. United States in 1984 and Murray v. United States in 1988, a second species was added to the genus, the Independent Source Doctrine. With Nix v. Williams in 1984, a third species was added to the genus, the Inevitable Discovery Doctrine. These two doctrines, however, do not involve attenuation, and attenuation criteria have no pertinence in the examination of these doctrines. When dealing with them, therefore, one cannot rely on Brown v. Illinois.

In actual attenuation analysis, the original tainted police activity remains the "cause" in the still pertinent chain of cause and effect. We measure the extent to which time or intervening circumstances have diluted or diminished the poisonous taint. LaFave, supra, §11.4(a) at 235, points out, "attenuation refers to 'diminution of thickness' or of 'density' or of 'force of intensity.'" In the other two doctrines, by contrast, we are not concerned with diluting or attenuating taint because the originally tainted police activity is no longer the cause in our new chain of causation. It has been displaced or superseded by a new and different cause: the issuance of the arrest warrant in the independent source cases and by a logically compelling supposition in the inevitable discovery cases.

Attenuation criteria are immaterial because in the new and superseding chains of causation, there is no longer any taint to be attenuated. The tainted cause of a discarded causative chain has been replaced by a new cause of a new and different causative chain, a cause that is untainted. Two chains of causation do not intertwine; they remain distinct. One chain of causation may have lead to a Terry frisk, but a completely different chain of causation lead to the search incident. They need not rise and fall together and they should

not be conflated. To conflate the two would mean that the search incident could not be deemed valid unless the frisk could also be deemed valid. We should only talk about attenuating taint, therefore, when we are literally dealing with the Attenuation of Taint Doctrine and not when we are dealing with the Independent Source Doctrine or the Inevitable Discovery Doctrine.

A superseding cause or an independent source, moreover, is by no means the same thing as "an intervening circumstance" that is a familiar factor in attenuation analysis. An intervening circumstance is something that happens within or along the original chain of causation. Webster's Third New International Dictionary (4th ed. 1976), at p. 1183, gives as definition 3 for "intervene": "to come in or between by way of modification." It is internal. "A (the bad Terry stop) leads to B which leads to C which leads to D (the recovery of evidence)." B and C are intervening circumstances that tend to interrupt movement along the cause-and-effect chain and thereby to dilute or weaken the force of the original taint. With the Independent Source Doctrine, by contrast, we look to a different and untainted cause as the starting point of an independent and distinct chain of causation. Webster's Third New International Dictionary (4th ed. 1976), at p. 2295, gives as definition 4 for "supersede": "to take the place of." Wong Sun, 371 U.S. at 487, explained that "the exclusionary rule has no application because the Government learned of the evidence from an independent source." Why then do we even speak of attenuating taint when there is no taint to attenuate?

Why, it might be asked, did these three very different species of exemptions from exclusion ever get grouped together in the first place? It was obviously because of the seductive power or siren song of the irresistible logical fallacy of "Post hoc, ergo propter hoc" – "After this; therefore, because of this." "The recovery of the evidence occurred after the chase; therefore, it must have occurred because of the chase!" It is a beguiling time sequence, but it is fallacious. The Attenuation of Taint Doctrine, indeed, calls for analysis under such a "post hoc" framework. The Independent Source Doctrine and the Inevitable Discovery Doctrine, on the other hand, do not. A preexisting arrest warrant is an independent source, and there is nothing that needs to be attenuated.

Although the two phenomena might occur at roughly the same moment in real time in a given investigative narrative, an "intervening circumstance," on the one hand, and an "independent source" or "superseding cause," on the other hand, are critically different and must not be confused with each other. An "intervening circumstance" is an event within a tainted chain of causation and is a factor in measuring the extent to which the taint has been diluted or attenuated. An "independent source" or "superseding cause," by contrast, is not an event within that tainted chain of causation. It is an overriding event that renders the tainted chain of causation immaterial. That chain of causation no longer matters. It has been displaced by an entirely different chain of causation that was never tainted in the first place and, therefore, needs no attenuation. An "independent source" is not an "intervening circumstance."

## Conclusion

The word "attenuate" is being casually misused to cover every variety of exemption from the exclusion of evidence under the Fruit of the Poisonous Tree Doctrine, whereas it is properly pertinent to only one of the three distinct modes of exemption. If, therefore, the caselaw robotically picks up attenuating-taint criteria from one species of exemption from exclusion and illogically imposes those criteria on a very different species of exemption, **HANDLE WITH EXTREME CAUTION**. The practical result may not be at risk, but the cogency of our analysis is.

**ORDER OF SUPPRESSION REVERSED AND CASE REMANDED FOR TRIAL; COSTS TO BE PAID BY APPELLEE.**

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 784

September Term, 2016

_____

STATE OF MARYLAND

v.

JAMAL RASHEED SIZER

_____

Graeff,
Leahy,
Moylan, Charles E., Jr.
     (Senior Judge, Specially Assigned),

JJ.
_____

Concurring Opinion by Graeff, J.
_____

Filed: November 29, 2016

I concur in the judgment only. I agree with much of the Majority Opinion, i.e., that the police had reasonable suspicion to detain appellant, and even if they did not and the initial detention was unlawful, suppression of the evidence obtained was not warranted because the discovery of the arrest warrant purged the taint of any illegal detention. I write separately because, although I agree that the judgment should be reversed, I respectfully do not agree with the conclusion that the independent source doctrine applies in this case.

As the Majority notes, there are three methods of "purging the taint" of unlawful police conduct that provide exceptions to the exclusionary rule:

> First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source. *See Murray v. United States*, 487 U.S. 533, 537 (1988). Second, the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source. *See Nix v. Williams*, 467 U.S. 431, 443-444 (1984). Third, . . . is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson*[ *v. Michigan*, 547 U.S. 586, 593 (2006)].

*Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (parallel citations omitted). *Accord Cox v. State*, 421 Md. 630, 652 (2011); *Williams v. State*, 372 Md. 386, 409 (2002). "These exceptions aim to balance the interests of society in deterring unlawful police conduct with the interest of ensuring juries receive all probative evidence of a crime." *Williams*, 372 Md. at 410.

I am not persuaded that the independent source doctrine applies to the circumstances of this case. That doctrine applies when the evidence seized is independent of the initial

illegality.  *See Segura v. United States*, 468 U.S. 796, 814 (1984) (although police unlawfully entered apartment, evidence seized in subsequent search pursuant to a warrant was admissible because "[n]one of the information on which the warrant was secured was derived from or related in any way to the initial entry").  Here, without the initial stop, the police would not have been in a position to arrest appellant pursuant to the warrant.

The Supreme Court of Missouri addressed a similar scenario in *State v. Grayson*, 336 S.W.3d 138 (Mo. 2011).  In that case, Grayson was illegally stopped and detained.  *Id.* at 146, 148.  The court rejected the State's argument that drug evidence nevertheless was properly admitted pursuant to the independent source doctrine:

> As the United States Supreme Court noted in *Nix* [*v. Williams*, 467 U.S. 431 (1984)], the purpose of the exclusionary rule is to ensure that "the prosecution is not to be put in a better position than it would have been if no illegality had transpired." *Id.* at 443. Conversely, the reason for the exceptions is to ensure that "the prosecution is not put in a worse position simply because of some earlier police error or misconduct." *Id.*

> Here, Officer Lambert obtained the bag of methamphetamine by taking advantage of the direct chain of events arising from the initial illegality perpetrated on Mr. Grayson. Had Mr. Grayson not been detained while driving innocently and further detained after Officer Lambert ascertained that he was not Terry Reed, then Officer Lambert never would have been in a position to arrest Mr. Grayson and later discover the bag of methamphetamine while inspecting the patrol car's backseat after transporting Mr. Grayson to jail. While the state may have properly arrested Mr. Grayson on the outstanding warrant at some point, it is not the arrest on the warrant but the conviction of possession of methamphetamine found in the patrol car some time after the arrest that is objected to here. Here, the "prosecution was put in a better position than it would have been if no illegality had transpired." *Nix*, 467 U.S. at 443.

*Grayson*, 336 S.W.3d at 150-151 (footnote and parallel citations omitted).

2

I agree with that analysis.  I disagree with the conclusion of the Majority that, if the initial stop was illegal, the independent source doctrine would apply to prevent exclusion of the evidence.

I would apply the attenuation doctrine in this case.  That is the rationale followed by the United States Supreme Court and the Maryland Court of Appeals in circumstances similar to the facts of this case.  *See Strieff*, 136 S. Ct. at 2061-63 (applying the attenuation doctrine and holding that "the evidence discovered on [defendant's] person was admissible because the unlawful stop was sufficiently attenuated by the pre-existing arrest warrant"); *Cox v. State*, 397 Md. 200, 212-22 (2007) (same); *Myers v. State*, 395 Md. 261, 285, 294 (2006) (same).

> Pursuant to the attenuation doctrine, the following facts must be considered:
>
> First, we look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search.  Second, we consider "the presence of intervening circumstances."  Third, and "particularly" significant, we examine "the purpose and flagrancy of the official misconduct."

*Strieff*, 136 S. Ct. at 2062 (citations omitted).

In the present case, although the temporal proximity weighed in favor of suppression, the intervening circumstance of the valid arrest warrant and the lack of evidence of flagrant police misconduct weighs against suppression of the evidence seized. I would conclude, as did the Court of Appeals in *Cox*, 397 Md. at 220, that "the arrest pursuant to the outstanding warrant sufficiently attenuate[d] any taint caused by the

3

arguably illegal stop." Accordingly, the gun and drug evidence discovered on appellant's person should not have been suppressed.