*Jamal Sizer v. State of Maryland*, No. 1, September Term, 2017. Opinion by Greene, J.

**CONSTITUTIONAL LAW – FOURTH AMENDMENT – REASONABLE SUSPICION**

The Court of Appeals held that the hearing court erred in suppressing evidence that was seized after a *Terry* stop because the hearing court did not consider the totality of the circumstances. On the basis that an officer has reasonable suspicion that criminal activity is afoot, an officer may conduct a *Terry* investigatory stop. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1969). When reviewing whether reasonable suspicion exists, a hearing court must apply the totality of the circumstances test, such that no one factor in the analysis is dispositive. The Court of Appeals held that where officers observed a group of individuals openly drinking what appeared to be an alcoholic beverage and one of them threw a bottle to the ground, the officers had reasonable suspicion to investigate a potential open container violation and to determine who threw the bottle. The defendant's flight from the group upon the officers' approach should have been considered as one factor among others in the totality of the circumstances analysis.

**CONSTITUTIONAL LAW – FOURTH AMENDMENT – EXCLUSION OF THE EVIDENCE – ATTENUATION DOCTRINE**

As explained by the United States Supreme Court recently in *Utah v. Strieff*, -- U.S. --, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016), to remove the taint from evidence obtained as a result of an illegal stop or search and seizure, the attenuation doctrine is the appropriate law to apply to determine admissibility of evidence when the defendant is arrested pursuant to the discovery of a pre-existing arrest warrant.

Circuit Court for Howard County
Case No. 13-K-15-056103
Argued: September 6, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 1

September Term, 2017

_____

JAMAL SIZER

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Greene, J.
Adkins and Hotten, JJ., concur and dissent.

_____

Filed: November 28, 2017

In the case before us, we are asked to consider the constitutionality of the stop and the subsequent search incident to the arrest of Petitioner, Jamal Sizer. On the evening of November 20, 2015, five or six officers of the Howard County Police Department Pathways Patrol Unit, a bicycle patrol unit, observed Mr. Sizer and others congregating in a public parking lot, drinking from what appeared to be an open alcohol container. The officers described the group as "loud and disorderly." The officers observed a bottle being thrown and heard it hit the ground, but could not see who threw the bottle. The officers approached the group to investigate who in the group threw the bottle. Mr. Sizer fled upon the officers' approach. A chase ensued and ended with the seizure of Mr. Sizer, which led to the discovery that he possessed a .38 caliber revolver in his backpack. Contemporaneously with the seizure of Mr. Sizer, an officer recognized Mr. Sizer as having an outstanding arrest warrant. Subsequently, pursuant to the discovery of the outstanding warrant, Mr. Sizer was arrested and taken to the local police precinct, where an officer searched Mr. Sizer incident to his arrest and recovered a baggie containing twenty-seven pills of oxycodone, a controlled dangerous substance, hidden in his sock.

Mr. Sizer filed a motion to suppress the firearm and the pills recovered from his person, and after a hearing, the Circuit Court for Howard County granted his motion. The State appealed, pursuant to Maryland Code, Courts and Judicial Proceedings Article, § 12-302(c)(4) (1973, 2013 Repl. Vol., 2016 Supp.). In a reported opinion, the Court of Special Appeals reversed the judgment of the Circuit Court, holding that the stop was constitutional. *State v. Sizer*, 230 Md. App. 640, 658, 149 A.3d 706, 717 (2016). The intermediate appellate court held in the alternative that, assuming arguendo that the stop

was unlawful, the evidence recovered would have been admissible under the independent source doctrine because Mr. Sizer was arrested on a valid pre-existing warrant that was independent of the illegal stop. *Id.* at 669, 149 A.3d at 723. A concurring member of the three-judge panel, Judge Kathryn Graeff, concluded that, assuming arguendo that the stop was illegal, the evidence that was recovered from Mr. Sizer would have been admissible under the attenuation doctrine, rather than the independent source doctrine, in light of this Court's decisions in *Myers v. State*, 395 Md. 261, 909 A.2d 1048 (2006), *Cox v. State*, 397 Md. 200, 916 A.2d 311 (2007), and the United States Supreme Court's decision in *Utah v. Strieff,* -- U.S. --, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016). *Id.* at 680–81, 149 A.3d at 730.

We review the issue of whether the officers had reasonable suspicion to stop Mr. Sizer. We hold that the officers had reasonable suspicion to conduct a stop when they witnessed what appeared to be criminal activity occurring immediately before the investigatory stop. In the alternative, we hold that, even assuming the stop was unlawful, the evidence recovered from Mr. Sizer would be admissible in evidence because the attenuation doctrine would apply, pursuant to the Supreme Court's reasoning in *Strieff*.

For reasons stated in this opinion, we shall affirm the judgment of the Court of Special Appeals to the extent that it held that the officers had reasonable suspicion to stop Mr. Sizer. We also, alternatively, affirm the judgment of the intermediate appellate court and adopt the reasoning of the concurring opinion, penned by Judge Graeff, with respect to the application of the attenuation doctrine.

2

# I.

*Initial Stop*

The relevant undisputed facts are taken from testimony presented at the suppression hearing. On the evening of November 20, 2015, five or six officers, from the Howard County Police Department Pathway Patrol Unit ("Patrol Unit"), on routine patrol, biked the footpaths that "lead all throughout Columbia, [Maryland]." While on the footpath, officers in the Patrol Unit observed a group of individuals "play fighting and passing around an alcoholic beverage back and forth." The Patrol Unit suspected that the beverage was alcohol because it was in a brown paper bag and the group's body language was "consistent with individuals drinking." The officers, from 25-35 yards away from the group, observed a bottle being thrown and heard it hit the ground, but could not see who threw the bottle. At that point, the officers approached the group to investigate. When the officers were approximately five feet away, Mr. Sizer fled on foot, away from the officers.

Officer Andrew Schlossnagle, one of the officers in the Patrol Unit, gave immediate chase and "physically took [Mr. Sizer] to the ground." As Mr. Sizer was being tackled to the ground, he revealed that he was carrying a handgun on his person. Within seconds of the takedown, another officer from the Patrol Unit recognized Mr. Sizer as the subject of an outstanding arrest warrant. At that point Mr. Sizer was arrested and taken to the police satellite station in the Village Center pursuant to the officers' belief that he was the subject of a pre-existing warrant. At the satellite station, the officers confirmed the existence of the warrant and performed a search of Mr. Sizer incident to his arrest. The officers recovered a .38 caliber handgun from Mr. Sizer's backpack and twenty-seven pills of

3

oxycodone, a controlled dangerous substance, from Mr. Sizer's sock. Additional facts will be discussed as needed.

*Suppression Hearing*

Mr. Sizer moved to suppress the weapon and the pills, arguing that the evidence was obtained pursuant to an unlawful stop. At the suppression hearing, members of the Patrol Unit testified that the Owen Brown Village Center was a "high" or "higher crime area," compared to other parts of Columbia, Maryland. The State argued that Mr. Sizer's flight in a high crime area was enough to give the officers reasonable suspicion to conduct a stop under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) ("*Terry* stop"); *see also Illinois v. Wardlow*, 528 U.S. 119, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) ("*Terry* stop in a high crime area").

The three testifying officers similarly characterized the Owen Brown Village Center as a high crime area. Officer Schlossnagle testified that the Owen Brown, Long Reach, and Oakland Mills Village Centers "tend to [have] an increase in calls for service and just general issues. There tends to be more calls for service in that – in those congested areas." When asked about what types of crimes he had investigated in the Owen Brown Village Center, the officer responded, "[W]e were tasked to Owen Brown because of the increased calls for service and on-going trends in the area." The Circuit Court judge interjected:

> [COURT]: Is "increased calls for service" a nice way of saying "high crime[]?"
> [OFFICER SCHLOSSNAGLE]: Yes, Your Honor.
> [COURT]: Thank you. I mean, just so I know what we're talking about.

4

Officer Schlossnagle explained that at the time of the incident, there was "an ongoing robbery series" and that "business owners . . . were complaining of quality of life issues, [such as controlled dangerous substance] violations, loitering, drinking, where the business centers requested an increased presence." Officer Schlossnagle also explained that "there was a report of a subject displaying a handgun the day before in the footpaths and fields that abut up to the village center." [1] He testified that "there is a network of footpaths that leads up to the back side of [the village center]." A second officer, Corporal James Zammillo, testified that the Owen Brown Village Center was a "high crime area" as compared to other parts of Columbia. Corporal Zammillo explained that his assignment as a member of the bike team patrol included "passively patrolling the ninety-plus miles of pathway that traverses through Columbia." Corporal Zammillo confirmed Officer Schlossnagle's testimony that there was "an ongoing robbery series" in the area.

A third officer, Officer Ronald Baker, the only witness called by the defendant, testified that the patrol officers had been "traveling the pathways, and we came across the Owen Brown Village Center, but we stopped at the entrance to the Owen Brown Village Center via [the] pathway." He explained that, at the time of observing the group of

---

[1] Collectively, the testimony from two officers about the location of the handgun incident can, at best, be described as ambiguous. On cross examination, one officer described the incident as having been reported "that there was a handgun seen in the *area* the day before[.]" On redirect, that officer testified that the handgun was displayed "near a school and also near a community center and a library[.]" Another officer testified that "there was an individual reportedly armed with a handgun and pointing it in the area [] passing the parking lot of the Howard County Library off Cradlerock."

5

individuals, he recognized one individual whom he knew had been banned from the Owen

Brown Village Center:

> [STATE]: Is Mr. Davis banned from the -- I believe it's the Owen Brown Village Center?
> [OFFICER BAKER]: Yes, he is.
> [STATE]: And you indicated -- did you indicate you were waiting for him, to see if he would enter where he was banned from?
> [OFFICER BAKER]: Yes.
> [STATE]: And where specifically was that?
> [OFFICER BAKER]: That particular area we were at, to the best of my knowledge, that parking lot isn't part of the village center. So, we was [*sic*] watching him and the group to see if they were going to enter the banned part of the village center.

Officer Baker also testified that when the officers were about five feet away, the group

noticed the officers. Officer Baker testified that his uniform consisted of a badge and the

word "Police" on the front of the jacket in neon lettering. Two other officers testified with

a similar description of their uniform. Later, in Officer Baker's testimony, he stated that it

appeared that Mr. Sizer ran as soon as Mr. Sizer observed the officers:

> [STATE]: How far away were you from this group of suspects -- subjects when you believed they noticed you?
> [OFFICER BAKER]: Well, as we approached, probably about five feet when they turned around to see us.
> [STATE]: And as soon as they noticed you, did Mr. -- did one of the suspects run?
> [OFFICER BAKER]: Yes.
> [STATE]: And did you write in your report that as soon as the suspect observed officers . . . Is that correct?
> [OFFICER BAKER]: Yes.
>                    *          *          *
> [STATE]: You indicated in your report that the subject ran as soon as he recognized you were there.
> [OFFICER BAKER]: It appeared that way; yes.

6

The officers testified that they were concerned with the group's general disorderliness and possible open container violations. None of the officers testified that they believed the group was connected to the "ongoing robbery series," or that they suspected any member of the group was the individual who had displayed a gun on the previous night.

After the three officers testified, the hearing judge first analyzed whether Mr. Sizer's flight was legally sufficient to conduct a *Terry* stop. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The hearing judge found all three testifying officers "to be truthful and credible" and that they had "testified today without embellishment." She found that "somebody [in] the group they cannot be sure whether it was Mr. Sizer or not -- threw a bottle. The police were concerned, understandably, and approached the group." The hearing judge found that "there had been a complaint made of someone brandishing or displaying a handgun in the parking lot of the Owen Brown Cradlerock Library, and there was, understandably, concern. In general, the area is considered a high or higher-crime area in Columbia." Nevertheless, the hearing judge suppressed the evidence, and, in doing so, indicated that she questioned whether "all the rules [were] followed[.]" The hearing judge explained, "[T]he fact that Mr. Sizer ran, in and of itself, based on the particular scenario that's being given here today, is not sufficient." Further, the hearing judge concluded that the pre-existing arrest warrant did not attenuate the taint of the unconstitutional stop.

7

*Procedural History*

The State appealed the Circuit Court's decision to suppress the evidence. The Court of Special Appeals reversed the suppression of the weapon and the pills, and held that given the totality of the circumstances, the stop was reasonably justified. *Sizer*, 230 Md. App. at 658, 149 A.3d at 717. The Court of Special Appeals alternatively held that had the stop not been constitutional, the evidence would not have been suppressed due to Mr. Sizer's pre-existing arrest warrant, although the three-judge panel disagreed as to the reason for non-suppression of the evidence. *Id.* at 669, 149 A.3d at 723.

Mr. Sizer petitioned this Court for *certiorari*, which we granted. *Sizer v. State*, 452 Md. 3, 155 A.3d 890 (2017). In the interest of clarity, we have condensed Mr. Sizer's questions for *certiorari* into two questions: Did the arresting officers have reasonable suspicion to stop Mr. Sizer, and if the arresting officers did not have reasonable suspicion to stop and detain Mr. Sizer, was the suppression of the evidence justified?[2]

---

[2] Mr. Sizer's petition for certiorari raised the following questions:

(1) Where the police illegally stop a person, discover a valid, pre-existing arrest warrant, and seize evidence from the person during a search incident to arrest, must the admissibility of that evidence be determined based on an application of the "attenuation factors," as held in *Utah v. Strieff*, 136 S. Ct. 2056 (2016), *Cox v. State*, 397 Md. 200 (2007), and *Myers v. State*, 395 Md. 261 (2006), or may a court, as the Court of Special Appeals did in this case, reject the attenuation doctrine and find that such evidence will always be admissible because the arrest warrant constitutes an "independent source"?

(2) Did the hearing judge correctly rule that the discovery of a valid, pre-existing arrest warrant did not attenuate the connection between the illegal "takedown" of Petitioner and the evidence seized from him shortly thereafter?

## II.

### *Standard of Review*

When reviewing a hearing judge's ruling on a motion to suppress evidence under the Fourth Amendment, we consider only the facts generated by the record of the suppression hearing. *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007). We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the party prevailing on the motion, in this case, Mr. Sizer. *Id.* We review the hearing judge's findings for clear error. *Id.*

Finally, we review the hearing judge's legal conclusions *de novo*, making our own independent constitutional evaluation as to whether the officer's encounter with the defendant was lawful. *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491, 497 (1999). In other words, our plenary review of the record for error requires application of the facts under a totality of the circumstances analysis.

---

(3) Where a person is under no obligation to interact with the police, does flight to avoid that interaction, by itself, justify a *Terry* stop; and if so, does it still justify the stop where there is evidence that flight was provoked by the threatening or startling actions of police officers?

(4) Did the hearing judge correctly rule that the police violated Petitioner's Fourth Amendment rights where, *inter alia*, six officers patrolling the footpaths of Columbia on unmarked bicycles after dark, who testified that, especially at night, people do not immediately recognize them as police, rode towards a loud group of people to investigate the improper disposal of a glass bottle, the group first noticed the officers when they were five feet away and was visibly "startled," and the only observation officers made regarding Petitioner before tackling him was that he immediately ran upon noticing the six bicyclists riding towards him?

**III.**

*Parties' Contentions*

Mr. Sizer's arguments generally focus on the officers' consideration of Mr. Sizer's flight in what the officers characterized as a high crime area. He asserts that the officers did not have a "particularized and objective basis" to support reasonable suspicion for the stop. Mr. Sizer correctly acknowledges that the United States Supreme Court has not imposed a bright-line rule that flight in a high crime area is always sufficient to generate reasonable suspicion of criminal activity. Mr. Sizer postulates, however, that if this Court affirms the suppression court's decision, it will effectuate a bright-line rule that neither the Supreme Court nor this Court has endorsed. Mr. Sizer relies on the Supreme Court's decision in *Wardlow* for his contention that flight is merely a display of a citizen's constitutional "right to ignore the police and go about his business." *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 676, 145 L. Ed. 570, 577 (2000). Finally, Mr. Sizer urges us to hold that flight should be given minimal weight in a totality of the circumstances analysis.

The State contends that Mr. Sizer's flight was merely one of many factors that the officers considered before attempting to conduct an investigatory stop. The State describes these factors as Mr. Sizer's flight, his presence in a high crime area, the group's general disorderliness, the suspected open container violation, and the improper disposal of a glass bottle. The State implicitly concedes that the officers did not have a particularized suspicion to stop Mr. Sizer at the moment they approached the group. Instead, the State argues that at the moment the officers approached the group, they had observed enough

10

suspicious activity to warrant further investigation based on the suspected littering and the passing around of an apparent open alcoholic container.

*Fourth Amendment Terry Stop*

The Fourth Amendment prohibits "unreasonable searches and seizures." Generally, when the government has violated a defendant's Fourth Amendment rights, courts are required to suppress evidence obtained as a result of an unconstitutional search or seizure. *Nardone v. United States*, 308 U.S. 338, 340–41, 60 S. Ct. 266, 267, 84 L. Ed. 307, 311 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391–92, 40 S. Ct. 182, 182–83. 64 L. Ed. 319, 321 (1920); *Weeks v. United States*, 232 U.S. 383, 398, 34 S. Ct. 341, 346, 58 L. Ed. 652, 657 (1914). The exclusionary rule is "ordinarily . . . the appropriate remedy for a violation of the Fourth Amendment." *Myers v. State*, 395 Md. 261, 278, 90 A.2d 1048, 1058 (2006). Where there is a valid, pre-existing and untainted arrest warrant, however, an exception to the exclusionary rule applies and the evidence obtained in violation of the Fourth Amendment is admissible under the attenuation doctrine. *Strieff*, -- U.S. at --, 136 S. Ct. at 2063, 195 L. Ed. 2d at 410.

Fourth Amendment jurisprudence, as it pertains to stops and seizures, operates along an escalating plane that begins with "unparticularized suspicion[s] or hunch[es]" and crescendos at probable cause. *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. at 909 (internal quotation marks omitted). Reasonable suspicion exists somewhere between unparticularized suspicions and probable cause. *See Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416, 110 L. Ed. 2d 301, 309 (1990). "And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his

11

inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. at 909.

Reasonable suspicion "has been defined as nothing more than 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Stokes v. State*, 362 Md. 407, 415, 765 A.2d 612, 616 (2001) (citing *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621, 628–29 (1981)) (internal quotation marks omitted); *see also Bost v. State*, 406 Md. 341, 356, 958 A.2d 356, 365 (2008). Moreover, reasonable suspicion is a "common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act." *Bost*, 406 Md. at 356, 958 A.2d at v365, (quoting *Stokes v. State*, 362 Md. 407, 415, 765 A.2d 612, 616 (2001)). The reasonable suspicion standard "'does not allow [a] law enforcement official to simply assert that innocent conduct was suspicious to him or her.'" *Crosby v. State*, 408 Md. 490, 508, 970 A.2d 894, 904 (2009) (citing *Bost v. State*, 406 Md. 341, 357, 958 A.2d 356, 365 (2008)). "Rather, the officer must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity." *Id.*; *see Derricott v. State*, 327 Md. 582, 591, 611 A.2d 592, 597 (1992).

When explaining the degrees of suspicion necessary for reasonable suspicion, the Supreme Court has explained that it is a lesser degree of suspicion than probable cause. *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416, 110 L. Ed. 301, 309 (1990). Specifically:

12

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Id.* (internal citations omitted).

There is no universal starting point when it comes to our analysis of a Fourth Amendment violation. We decide where along the plane to begin our analysis depending on the circumstances before us. Here, our analysis begins at reasonable suspicion. We recognize that it is "importan[t] . . . not [to] focus[] on any set list of facts that must be present for reasonable suspicion to exist, but rather to examine the totality of the circumstances to determine whether an officer could reasonably suspect that criminal activity is afoot." *State v. Holt*, 206 Md. App. 539, 558, 51 A.3d 1, 12 (2012), *aff'd*, 435 Md. 443, 78 A.3d 415 (2013).

*Cartnail* explains the two analytical techniques used in assessing the totality of the circumstances:

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions— inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities.

\*     \*     \*

13

> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio* . . . said that, "[t]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence*."

*Cartnail v. State*, 359 Md. 272, 288, 753 A.2d 519, 527–28 (2000) (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 698, 66 L. Ed. 2d 621, 629 (1981)) (some internal quotations omitted).

*The Totality of the Circumstances Analysis*

Both parties agree that our totality of the circumstances analysis must focus on reasonable suspicion, but they dispute whether the factors rise to the level of reasonable suspicion. Petitioner contends that the totality of the circumstances do not rise to reasonable suspicion, even if flight is considered in the Court's analysis. To the contrary, Respondent argues that even if flight is not considered the officers had reasonable suspicion to stop Mr. Sizer. Petitioner draws our focus to the unprovoked flight factor to refute the officers' reasonable suspicion, whereas Respondent focuses our attention on the high crime area factor as a means of justifying the officers' reasonable suspicion surrounding the stop. Because the totality of the circumstances analysis "does not deal with hard certainties," we determine that an individual's unprovoked flight or presence in a high crime area, or both, are individual factors that may contribute to the reasonable suspicion calculus. *Id.*

In *Wardlow,* which both parties rely on to advance their opposing views, the United States Supreme Court discussed the weight to be given unprovoked flight in a high crime area as one factor in the totality of the circumstances analysis. *Illinois v. Wardlow*, 528

14

U.S. 119, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). In *Wardlow*, a team of eight officers, in a four car caravan, travelled through a Chicago neighborhood known for "heavy narcotics trafficking." *Id.* at 124, 120 S. Ct. at 676, 145 L. Ed. at 576. The defendant, Wardlow, held an opaque bag in his hand, and upon noticing the last car in the police caravan, fled on foot from the outside area where he stood. *Id.* at 122, 120 S. Ct. at 675, 145 L. Ed. at 575. Two officers chased him on foot, and when they finally caught him, they conducted a pat-down and search for weapons. *Id.* The opaque bag he held contained a .38 caliber handgun. *Id.* The suppression hearing judge denied Wardlow's motion to suppress the handgun, the Illinois Appellate Court reversed, and the Illinois Supreme Court affirmed the intermediate appellate court's conclusion that the evidence should be suppressed. *Id.*

The United States Supreme Court reversed the decision of Illinois' highest court as to suppression of the evidence. *Wardlow*, 528 U.S. at 126, 120 S. Ct. at 677, 145 L. Ed. at 577. The Supreme Court held that flight in a high crime area was relevant in a totality of the circumstances analysis. It opined that:

> An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" *among* the relevant contextual considerations in a *Terry* analysis.

*Id.* at 124, 120 S. Ct. at 676, 145 L. Ed. at 576 (internal citations omitted) (emphasis added). Specifically, the Supreme Court explained:

15

In this case, moreover, it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.

*Id.* (internal citations omitted).

In *Bost v. State*, we had occasion to consider whether a defendant's flight in a high crime area supplied officers with the necessary reasonable suspicion to stop him. 406 Md. 341, 348, 958 A.2d 356, 359 (2008). Officers observed Mr. Bost and a group of people drinking alcohol and loitering on a sidewalk in a drug-trafficking area, located in Washington, D.C., three blocks from the Maryland border. *Id.* at 346, 958 A.2d at 360. As the officers approached Mr. Bost, he began briskly walking away and took flight "while clutching his right waistband . . . ." *Id.* An officer pursued him on foot, under the suspicion that he was concealing a weapon and based on the officer's experience that Mr. Bost's clutching of his waistband was consistent with someone trying to conceal a weapon. *Id.* Officers tackled him to the ground and then found a gun tied around his neck. *Id.* Officers arrested him, and upon a search incident to the arrest, discovered $140 in cash and two, white, rock-like substances, later determined to be crack cocaine, on his person. *Id.* Mr. Bost moved to suppress the seized cocaine and weapon on the basis that the evidence was

16

seized in violation of the Maryland Uniform Act on Fresh Pursuit.[3] *Id.* at 347, 958 A.2d at 358.

Upon review, we held that officers had reasonable suspicion to stop Mr. Bost because he was seen in a high crime, drug-trafficking area, he took off in unprovoked flight, and he was clutching his side, in what appeared to be an attempt to conceal a weapon. *Id.* at 359–60, 958 A.2d at 360. In the case, we relied on *Wardlow* for the generalized proposition that that case "had made clear that unprovoked flight is *enough* to support reasonable suspicion that a crime has been committed." *Id.* at 348, 958 A.2d at 360 (emphasis added). Notwithstanding our focus on unprovoked flight, in *Bost* we applied a totality of the circumstances analysis, as the *Wardlaw* Court had done, and held that Mr. Bost's unprovoked flight was properly considered in the totality of the circumstances analysis. *Id.* at 359, 958 A.2d at 360.

In *Crosby*, we emphasized the need for hearing courts to consider the totality of the circumstances when wholly innocent actions take place in a high crime area. *Crosby v. State*, 408 Md. 490, 508, 970 A.2d 894, 904 (2009). In that case, an arresting officer, at the suppression hearing, testified that he made the decision to approach a driver in a parked car because: the driver was in a high crime area, he pulled in and out of "parking pads," he was in an area where a recent homicide had occurred, he switched his left turn signal to a

---

[3] The Uniform Act on Fresh Pursuit [Maryland Code, Criminal Procedure § 2-305 (2001, 2006 Cum. Supp.)] permits "[a] member of a state, county, or municipal law enforcement unit of another state who enters [Maryland] in fresh pursuit and continues within [Maryland] in fresh pursuit of a person to arrest the person on the ground that the person is believed to have committed a felony in the other state has the same authority to arrest . . . the person." *Bost v. State*, 406 Md. 341, 345, 958 A.2d 356, 358 n.1 (2008).

17

right turn signal, and he drove in a "big loop." *Id.* at 500, 970 A.2d at 899. We reversed the Circuit Court's denial of Mr. Crosby's motion to suppress the evidence and held that the factors the arresting officer relied on "[did] not constitute ingredients that [were] sufficiently potent enough in [that] case to enrich the porridge to the constitutionally required consistency of reasonable suspicion," because "the combination of [innocent] factors, viewed in their totality, [were] no more indicative of criminal activity than any one factor assessed individually." *Id.* at 511–513, 970 A.2d at 906–07.

*The Hearing Judge's Analysis of the Totality of the Circumstances*

In the instant case, although we determine that the police officers had reasonable suspicion to stop Mr. Sizer, we conclude that the suppression hearing judge erred in her application of the totality of the circumstances analysis because she based her decision on ambiguous testimony and identified Mr. Sizer's flight as the dispositive factor in the analysis. The suppression hearing judge did not properly consider other pertinent factors in her application of the totality of the circumstances analysis.

There was no evidence at the suppression hearing that established that the parking lot was located in the Owen Brown Village Center or established how near it was to the Owen Brown Village Center or the area where the handgun violation had occurred. In fact, Officer Baker testified that "to the best of [his] knowledge, that parking lot isn't part of the [V]illage [C]enter." He also testified that the Patrol Unit was "waiting to see if [one of the members of Mr. Sizer's group] would enter where he was banned from." Given that the officer was waiting to see whether a certain individual would enter the banned Village

18

Center area, this individual, along with the remaining group members, including Mr. Sizer, was not in the Owen Brown Village Center.

The suppression hearing judge did not receive any testimony regarding whether the group was connected in any way to the Owen Brown Village Center. None of the officers testified that the group, or any member of the group, was seen leaving or approaching the Village Center at any time during the officers' patrol of the pathways. The officers did not observe anyone joining or leaving the group during their time of observation. Nor did they testify that they observed the group demonstrating behavior consistent with the nature of the crimes that led them to conclude that the Village Center was a high crime area. Furthermore, none of the officers testified that they suspected any member of Mr. Sizer's group to be connected to the weapon violation that had been reported the previous day. As was true for the location of the Village Center, the two officers who testified about the handgun violation did not provide any proximal description of the area where the violation had occurred and its relation to the parking lot where Mr. Sizer was observed.

Because we determine that the Circuit Court erred in its application of the totality of the circumstances analysis, we need not decide whether the Circuit Court's erred in finding that the parking lot was a "high or higher crime area." In her analysis, the suppression hearing judge did not consider other pertinent factors in their totality, such as the officers' suspicion of an open container violation or their attempt to investigate the littering. Instead she found that, "the fact that Mr. Sizer ran, in and of itself, based on the particular scenario . . . [was] not sufficient" to justify the stop. The hearing judge had sufficient facts before her to apply the reasonable suspicion test from *Terry*, but she

19

overlooked the import of two possible crimes that had occurred in the officers' presence along with Mr. Sizer's unprovoked flight as officers approached to investigate. In other words, her analysis abandoned consideration of the *totality* of the circumstances. "Under the totality of circumstances, no one factor is dispositive." *In re David S.*, 367 Md. 523, 535, 789 A.2d 607, 614 (2002). Therefore, the hearing judge erred when she failed to consider the totality of the circumstances. [4]

*Our Analysis of the Totality of the Circumstances*

Upon our independent review of the factors that were before the hearing judge, we hold that under the totality of the circumstances, the officers had reasonable suspicion to stop Mr. Sizer to investigate a possible open container violation as well as the improper disposal of a glass container, whether he was in a high crime area or not. Even Mr. Sizer concedes that when the officers approached him they were "investigating the improper disposal of a bottle." Pursuant to Maryland Code, Criminal Law § 10-110 (2002, 2012 Repl. Vol., 2015 Supp. Vol.), the improper disposal of waste is a criminal misdemeanor punishable by imprisonment or fines.[5] Pursuant to the Howard County Code, Title 8,

---

[4] According to the Concurring/Dissenting Opinion, the Majority Opinion mischaracterizes the hearing judge's conclusions of law. Concurrence/Dissent Slip Op. at 7. The Concurrence/Dissent concludes that the hearing judge considered the totality of the circumstances in her "scenario" but fails to explain what law the hearing judge applied to the facts in order to conclude that Mr. Sizer's flight and the "scenario" was not sufficient. Without more, neither we, nor the Concurrence/Dissent can say precisely what the hearing judge meant when she concluded that the "scenario" was insufficient.

[5] Mr. Sizer was not charged with improper disposal of waste or with an open container violation.

20

Subtitle 7, § 8.700 (2016), consuming or possessing alcoholic beverages on posted commercial property or posted public parking lots is a criminal misdemeanor punishable by imprisonment or fines. Therefore, when officers observed that a bottle was passed among the group and then was discarded or thrown to the ground, they had reasonable suspicion to believe that criminal activity was afoot. Mr. Sizer's flight from the group as the officers approached to investigate probable crimes committed in their presence shifted their focus to Mr. Sizer, which could have reasonably heightened their suspicion that he was the individual responsible for throwing the bottle. When Mr. Sizer ran, his flight obviously drew the officers' attention and intensified the officers' investigation by shifting their focus from the group to him as an individual. In fact, according to Officer Baker, who testified at the suppression hearing, it appeared that Mr. Sizer ran as soon as he realized that the people approaching were police. Thus, in conducting their investigation the officers were not required to "simply shrug [their] shoulders and allow . . . [an apparent] criminal [misdemeanant] to escape." *Holt v. State*, 435 Md. 443, 459, 78 A.3d 415, 424 (quoting *Adams v. Williams*, 407 U.S. 143, 145, 92 S. Ct. 1921, 1923, 32 L. Ed. 2d 612, 616)).

Mr. Sizer asserts that "officers can 'investigate' whatever they want, for any reason they want, but they cannot stop a person without reasonable suspicion that criminal activity is afoot," and that here the officers' testimony was insufficient to establish reasonable suspicion that a crime was being committed. We disagree that the investigating officers' testimony in this case was insufficient to establish reasonable suspicion of suspected criminal activity because Mr. Sizer overlooks the significance of the officers' decision to investigate based on the improper disposal of the bottle. The investigatory nature of a stop

21

does not violate the Fourth Amendment if the stop is based on a reasonable suspicion. *See Terry*, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. at 909 ("And in determining whether the officer acted reasonably in such circumstances, due weight must be given . . . to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.").

This Court has previously examined how the Supreme Court has reconciled the tension between an individual's right to freedom from unlawful detainment and the extent to which an officer may conduct an investigatory stop and we recognized that the Supreme Court held that officers may "stop and briefly detain a person for investigative purposes if the officers have a reasonable suspicion, supported by articulable facts, that 'criminal activity' may be afoot." *In re David S.*, 367 Md. at 532, 789 A.2d at 612 (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884, 20 L. Ed. 2d 889, 911 (1969); *see United States v. Scott*, 270 F.3d 30, 41 (1st Cir. 2001) (recognizing that "[a]n individual's flight from police combined with other observations by a police officer may support reasonable suspicion sufficient for detention under *Terry*" and also acknowledging that "[i]n *Wardlow* itself, the only relevant fact other than flight known to the detaining officer was the suspect's presence in an area known for crime," and noting that "prior behavior . . . suggest[s] guilt more strongly than would simple presence in such an area") (internal citations omitted).

In summation, the officers had reasonable suspicion to investigate the group prior to Mr. Sizer's flight. The officers suspected that members of the group were consuming alcohol; then the officers observed the improper disposal of a bottle. Because a bottle was

22

thrown to the ground, it logically follows that at least one member of Mr. Sizer's group was responsible for the improper disposal of the bottle. Mr. Sizer's flight, however, drew the officers' attention away from the group and towards him individually. Based on these circumstances, we conclude that the officers had reasonable suspicion to stop Mr. Sizer. After being informed that he was armed with a weapon, the officers had reasonable suspicion to frisk him.[6] Therefore, we affirm the judgment of the intermediate appellate court on the basis that upon witnessing the likelihood that criminal activity was afoot, the officers had reasonable suspicion to approach the group and investigate an apparent open-container violation and littering and to stop Mr. Sizer.

*Application of the Attenuation Doctrine*

Our primary holding is that the apprehension of Mr. Sizer after he ran from the group that was assembled in the parking lot constituted a valid *Terry* stop. We hold, in the alternative, that assuming the stop of Mr. Sizer was unlawful, the police officer's discovery of a valid pre-existing arrest warrant attenuated the connection between any unlawful investigatory stop and evidence seized from Mr. Sizer during the search incident to his

---

[6] The Concurring/Dissenting Opinion describes the stop of Mr. Sizer as a "hard take-down" and criticizes the officer's conduct as unreasonable. Con./Diss. Slip Op. at 10-11. To support its contention that the take-down was unreasonable, the Concurring/Dissenting Opinion cites to *Graham v. Connor,* 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). In that case, however, the Supreme Court points out that "whether [the suspect] is actively resisting arrest *or* attempting to evade arrest by flight" is among the factors considered under the objective reasonableness standard. *Id.* at 396, 109 S. Ct. at 1872, 104 L. Ed. 2d at 445 (emphasis added). Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S. Ct. at 1872, 104 L. Ed. 2d at 455–56.

23

arrest. Accordingly, there would be no justification for applying the exclusionary rule to the facts of this case.

The State and Mr. Sizer concur that *Utah v. Strieff* would control the outcome of this case if the stop were deemed unlawful. In its brief, the State pressed the argument that the independent source doctrine or the attenuation doctrine would apply; however, at oral argument, counsel for the State conceded that the attenuation doctrine was on point based on the facts. Mr. Sizer agrees that the outstanding arrest warrant is an intervening circumstance pursuant to *Strieff*; however, he bifurcates the evidence recovered from his person to suggest that the pre-existing arrest warrant operates as an intervening circumstance only with respect to the pills, not the revolver. Mr. Sizer argues that the evidence of the revolver "came to light before the officers discovered a valid warrant for Petitioner's arrest."

Recently, in *Strieff*, the United States Supreme Court applied the attenuation doctrine when it evaluated whether a pre-existing arrest warrant sufficiently attenuated "the causal link between the government's unlawful act and the discovery of evidence[.]" -- U.S. at --, 136 S. Ct. at 2061, 195 L. Ed. 2d at 408. We follow the precedent of that Court, which directs us to evaluate the three factors articulated in *Brown*:

> First, we look to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider "the presence of intervening circumstances." Third, and "particularly" significant, we examine "the purpose and flagrancy of the official misconduct."

24

*Strieff*, -- U.S. at --, 136 S. Ct. at 2062, 195 L. Ed. 2d at 408 (citing to *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S. Ct. 2254, 2261–62, 45 L. E. 2d 416, 427 (1975) (internal citations omitted). In *Strieff*, the Supreme Court reasoned that that an outstanding arrest warrant was "a critical intervening circumstance that is wholly independent of the illegal stop" and therefore the illegal stop was "sufficiently attenuated by the pre-existing arrest warrant." -- U.S. at --, 136 S. Ct. at 2063, 195 L. Ed. 2d at 410 (internal citation omitted) (internal quotation marks omitted); *see also Myers v. State*, 395 Md. 261, 290, 909 A.2d 1048, 1065 (2006); *Cox v. State*, 397 Md. 200, 209–10, 916 A.2d 311, 316–17 (2007).

The application of the attenuation doctrine is a fact-specific analysis that focuses on when and the manner in which the evidence seized was obtained in relation to the unlawful conduct. Where there is an outstanding arrest warrant, the attenuation doctrine applies because the discovery of the warrant breaks the causal chain from any possible taint to the evidence collected. Here, even assuming that the stop of Mr. Sizer was unlawful, the discovery of a valid pre-existing arrest warrant as well as absence of flagrant police misconduct, notwithstanding the close temporal proximity between the illegal seizure and the discovery of the pistol, would result in the non-suppression of the evidence. Mr. Sizer focuses on the closeness of the timing of the discovery of the revolver in relation to the discovery of the outstanding arrest warrant. He argues that because his admission about the revolver came before the discovery of the outstanding warrant, the warrant could not attenuate the taint of the alleged unlawful stop. We disagree. We have previously held that "the question of timing is not dispositive on the issue of taint, *especially* because there was an outstanding arrest warrant between the initial stop and the subsequent search

25

incident to arrest, even though some of the evidence was discovered shortly after the illegal stop." *Myers*, 395 Md. 261, 292, 909 A.2d at 1066 (emphasis added). The "temporal proximity" between Mr. Sizer's alleged unlawful stop and the discovery of the revolver favors suppression of the evidence; however, this factor is outweighed by the intervening circumstance and the absence of flagrant police misconduct. *See e.g. Cox v. State*, 397 Md. 200, 218, 916 A.2d 311, 322 (2007) (holding that a two minute time lapse weighed in the defendant's favor but recognizing that, "[t]he temporal proximity factor must depend . . . on other factors to which it relates, because a 'lengthy detention can be used to exploit an illegal arrest at least as easily as a brief detention.'" (quoting *Ferguson v. State*, 301 Md. 542, 550 483 A.2d 1255, 1259 (1984)). The discovery of the pre-existing warrant sufficiently broke the causal chain between any Fourth Amendment violation alleged by Mr. Sizer and the recovery of the evidence against Mr. Sizer. Therefore, had the stop of Mr. Sizer been unlawful, the evidence recovered would still be admissible under the attenuation doctrine.

*Conclusion*

The officers of the Patrol Unit had reasonable suspicion to investigate what appeared to be criminal acts occurring in their presence and, thus, had reasonable suspicion to stop Mr. Sizer to investigate whether he had improperly disposed of a bottle. The stop was not unconstitutional. During the course of the stop, Mr. Sizer alerted the officers to the presence of a gun, which justified the officers' frisk of his person. The gun and the pills should not have been suppressed because they were recovered after a lawful detention. Alternatively, the gun and the pills would be admissible into evidence as a result of the

26

search incident to the lawful arrest of Mr. Sizer, pursuant to the discovery of the outstanding arrest warrant.  We affirm the judgment of the Court of Special Appeals, albeit for different reasons.  Accordingly, the motion to suppress should have been denied.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT TO BE PAID BY PETITIONER.**

Circuit Court for Howard County
Case No.:  13-K-15-056103
Argued: September 6, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 1

September Term, 2017

JAMAL SIZER

v.

STATE OF MARYLAND

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Concurring and Dissenting Opinion by Adkins, J.,
which Hotten, J., joins.

Filed: November 28, 2017

At a suppression hearing, the State has the burden to "articulat[e] a sufficient factual basis for the stop, and appellate courts cannot fill in blanks in the evidentiary record." *In re Jeremy P.*, 197 Md. App. 1, 22 (2011). Most respectfully, I write separately because the State did not meet its burden of showing that the totality of the circumstances created reasonable suspicion justifying the officers' decision to chase Mr. Sizer and use a hard take-down. We should not resolve this case by repairing the deficiencies in the State's arguments and evidence to provide a sufficient factual basis for reasonable suspicion.

Despite my conclusion that this was an unreasonable seizure, the discovery of a valid arrest warrant was a sufficiently attenuating circumstance that the evidence located is admissible. For that reason, I dissent from the Majority's holding that the stop was reasonable, but concur in the alternative holding that the evidence should have been admitted through attenuation.

## REASONABLENESS OF THE CHASE AND HARD TAKE-DOWN

When evidence is obtained pursuant to a warrantless search or seizure, the **State** carries the burden in a suppression hearing to justify the lawfulness of the officers' conduct and demonstrate that the evidence is admissible. *See Grant v. State*, 449 Md. 1, 30 (2015) ("[W]ithout satisfying its burden of proof, the State did not establish that the evidence was admissible . . . ."); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971). "[T]he officer must explain how the observed conduct, when viewed in the context of all the other circumstances known to the officer, was indicative of criminal activity." *Crosby v. State*, 408 Md. 490, 508 (2009). A reviewing court accepts the suppression court's factual findings unless they are clearly erroneous. *Raynor v. State*, 440 Md. 71, 81 (2014).

Because Mr. Sizer's Motion to Suppress was granted, inferences in this case should be drawn in the light most favorable to him. *Id.*

Here, the Majority concludes that the hearing "judge erred in her application of the totality of the circumstances analysis because she based her decision on ambiguous testimony and identified Mr. Sizer's flight as the dispositive factor in the analysis." Maj. Slip Op. at 18. In the Majority's view, the hearing judge "did not consider other pertinent factors in their totality, such as the officers' suspicion of an open container violation or their attempt to investigate the littering." *Id.* at 18. Instead, the Majority rules that she "abandoned consideration of the *totality* of the circumstances" by concluding that "'the fact that Mr. Sizer ran, in and of itself, based on the particular scenario . . . [was] not sufficient,'" to find that the officers had reasonable suspicion that Mr. Sizer was engaged in criminal activity. *Id.* at 19–20 (Emphasis in original).

The Majority uses this conclusion to evade the deficiencies in the State's claims that the officers had reasonable suspicion to detain Mr. Sizer. The State relied heavily on *Illinois v. Wardlow*, 528 U.S. 119 (2000), as well as our own similar precedent, for the proposition that unprovoked flight in a "high crime area"[1] provides sufficient reasonable suspicion to justify an investigatory detention in this case. The Majority rightfully appears skeptical of the evidence the State supplied that suggests that this incident took place in a "high crime" area, but avoids addressing the issue by deciding that the Circuit Court for

---

[1] The term "high crime area" has never been defined in legal jurisprudence. *See* Andrew Guthrie Ferguson & Damien Bernache, *The "High Crime Area" Question: Requiring Verifiable and Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis*, 57 Am. U. L. Rev. 1587, 1590–91 (2008).

Howard County erred in applying the totality of the circumstances analysis. The Majority concludes that upon a review of the factors before the hearing judge, the officers had reasonable suspicion to detain Mr. Sizer for a possible open container violation and improper disposal of a bottle regardless of whether or not he was in a high crime area.

Reasonable suspicion requires a determination that, under the totality of the circumstances, officers had a "particularized and objective basis for suspecting the **particular person stopped** of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981) (emphasis added); *see also Longshore v. State*, 399 Md. 486, 507 (2007). In evaluating the constitutionality of an investigatory detention, we consider "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). The issue is, whether under the totality of the circumstances, officers had a reasonable articulable suspicion that **Mr. Sizer** was engaged in criminal activity that justified their decision to seize him, and whether that seizure was "reasonably related in scope" to the circumstances justifying that suspicion. *Id.*

The tenor of the State's arguments suggest that reviewing courts should simply accept the "high crime" designation when officers provide general information about some criminal activity in an area (whatever area that may be), and opine that the area is "high" or "higher" crime. Whether an activity occurs in a high crime area can inform a police officer's analysis about the activity that is taking place. *Bailey v. State*, 412 Md. 349, 383–84 (2010). A suspect need not be connected to previous crimes in the area, *Holt v. State*, 435 Md. 443, 466 (2013), but the nature of the area is relevant to reasonable suspicion

3

when the suspect's activities appear to be the kind of criminal activity that is **likely** to be occurring there. A generalized description of an area as "high crime," without a greater connection to the observed activities, does not support reasonable suspicion. *See Bailey*, 412 Md. at 384. Other Maryland cases addressing *Terry* stops in high crime areas demonstrate that the nexus between the nature of the area and the observed activities is significant in determining whether officers had reasonable suspicion. *See Chase v. State*, 449 Md. 283, 289 (2016) (detaining individuals for suspicion of drug trafficking based on behavior in area known for drug trafficking); *Cox v. State*, 161 Md. App. 654, 671–74 (2005) (individual suspected of drug dealing had been warned away from intersection known for heroin trafficking earlier, when officers saw him again, he fled, committing a traffic infraction); *Wise v. State*, 132 Md. App. 127, 134 (2000) (suspect's actions in neighborhood known for drug trafficking coupled with flight after seeing officers justified investigatory detention).

Federal precedent provides further support. In *Wardlow*, the suspect was in an area of Chicago "known for heavy narcotics trafficking" and the officers expected to encounter individuals who were involved in those activities. 528 U.S. at 124. Wardlow's behavior and subsequent flight triggered the officer's suspicion that he was engaged in drug trafficking. In *United States v. Wright*, 485 F.3d 45, 53–54 (1st Cir. 2007), relying on *Wardlow* and other circuits' precedent, the First Circuit identified three specific factors relevant to the "high crime" designation, and the designation's relationship to reasonable suspicion. First, "the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case"; second, the "limited geographic

boundaries of the area"; and third, "temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue . . . ." *Id. See also United States v. Carruthers*, 458 F.3d 459, 468 (6th Cir. 2006); *United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005); *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001); *United States v. Montero-Camargo*, 208 F.3d 1122, 1138–39 (9th Cir. 2000) (en banc).

Applying these factors, I conclude that the State failed to show that the Owen Brown Village Center is a high crime area—a conclusion the Majority seems poised to reach, but then abandons.[2] Increased calls for service[3] and concerned business owners do not permit a conclusion that an area is "high crime." An ongoing series of robberies at unknown locations and times, as well as a single sighting of an individual with a handgun do not suffice absent greater specificity. Even assuming that these incidents could be sufficient for a finding that the area is "high crime," there is no nexus between these crimes and the activity in this case, or between these crimes and Mr. Sizer.[4] For these reasons, I do not

---

[2] The Majority points out that the group was not in the Owen Brown Village Center, which the officers testified was a "high crime area." The Majority also notes that the officers did not testify that the group's behavior was "consistent with the nature of the crimes that led them to conclude that the Village Center was a high crime area." The officers' testimony did not connect the string of robberies or the suspected gun violation to the group. Maj. Slip Op. at 19.

[3] Officer Schlossnagle admitted that increased calls for service are not necessarily indicative of criminal activity, but only demonstrate that someone called the police.

[4] Corporal Zammillo's testimony about the satellite office is not particularly persuasive in the "high crime" analysis. During cross-examination, he explained that there are five satellite offices at five villages in Columbia. Mr. Sizer points out that because there are ten villages in Columbia, half the villages have a satellite office. The presence of this office, absent further evidence, does not support a conclusion that Owen Brown Village is "high crime."

5

find sufficient evidence to support the State's contention that *Wardlow* is dispositive precedent.

The Majority's determination that the hearing judge abandoned the totality of the circumstances appears to be a mischaracterization of the hearing judge's conclusions of law. The hearing judge concluded "the fact that Mr. Sizer ran, in and of itself, based on the particular scenario that's being given here today, is not sufficient." The Majority explains that this is erroneous because no single factor is dispositive in the analysis. Maj. Slip Op. at 20. It is evident, upon review of the record that the hearing judge **did** apply the totality of the circumstances analysis.

The officers observed a loud group in a parking lot from 25 to 35 yards away, and the officers thought that **some** individuals in the group **might** be consuming alcohol.[5] The officers also testified that someone threw a bottle, but they did not know who threw it, or even where the bottle originated in the group. They approached to determine who threw the bottle. The State highlights these facts, as well as two others—that the group was in a "high crime area" and that only Mr. Sizer fled when the officers approached—to argue that the officers had sufficient reasonable suspicion to seize Mr. Sizer.[6]

---

[5] The officers' testimony is vague regarding which, if any, individuals might have been committing alcohol violations, or indeed whether an alcohol violation was occurring. The officers testified that some of the individuals in the parking lot "appeared to be" drinking alcohol. Schlossnagle testified that "[t]here were bottles that appeared to be alcohol bottles and cans . . . [A]nd a brown bag, a—bottle in a bag . . . ." Zammillo testified that he saw "body language [that] was consistent with individuals that were consuming alcohol; hanging around, passing a bottle back and forth."

[6] Mr. Sizer was seized when the officers tackled him. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (seizure requires either physical force, or if no force, submission

6

The hearing judge considered all of these factors in reaching her decision that the seizure was unreasonable.[7]  She did not doubt what the officers had observed, but the officers never saw **Mr. Sizer** engaging in any of these activities.  Thus, at the moment the officers reached the group, they had no reasonable articulable suspicion that **Mr. Sizer** was engaged in criminal activity.  He was with a **group of individuals**, some of whom **might**

---

to authority).  *Terry* stops are undisputedly seizures.  *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

[7] In formulating the "scenario," the hearing judge explained:

> The police testified today without embellishment.  The Court found them to be truthful and credible.  The issue for the Court, as I outlined it at the beginning, is the time-line.  So as I understand it, and from the testimony of the officers, it's that they're there.  They're in a darker less lit area.  They see this group of individuals which includes the Defendant, Mr. Sizer.  That the group appears to be loitering; that the group appears to be drinking alcohol, open containers, and that somebody of the group—they cannot be sure whether it was Mr. Sizer or not—threw a bottle.  The police were concerned, understandably, and approached the group.  They were in uniform.  On their bright-blue jackets are their respective names and the word "Police", and they verbally identified themselves as police.  While they themselves had been in a darker area, the testimony was that there was sufficient lighting in the parking lot area to see the group.

> The issue before the Court is, when Mr. Sizer ran, was it reasonable for the police to run after him?
> \*\*\*
> And although I can understand the heat of the moment, I can understand the high crime area, the fact that Mr. Sizer ran, in and of itself, based on the particular scenario that's being given here today, is not sufficient.

have been engaging in misdemeanor activities.[8]  The hearing judge decided that this "scenario," combined with Mr. Sizer's flight, could not provide a sufficiently particularized reasonable suspicion to detain him.

The Majority notes that the State "implicitly concedes that the officers did not have a particularized suspicion to stop Mr. Sizer at the moment they approached the group." Maj. Slip Op. at 10.  It is unclear whether the Majority thinks that the officers were stopping the entire group under *Terry*, or whether the officers were merely accosting the group.  The Majority reasons that "Sizer's flight from the group as the officers approached to investigate probable crimes committed in their presence shifted their focus to Mr. Sizer, which could have reasonably heightened their suspicion that he was the individual responsible for throwing the bottle." *Id.* at 21.  The Majority places too much weight on Mr. Sizer's flight.

Unprovoked flight is a factor in the totality of the circumstances analysis.  *See Wardlow*, 528 U.S. at 125; *Bost v. State*, 406 Md. 341, 358 (2008); *Collins v. State*, 376 Md. 359, 372 (2003).  Based on the evidence presented, it appears that the officers had a

---

[8] Littering is a misdemeanor.  *See* Maryland Code (1957, 2012 Repl. Vol., 2016 Supp.), § 10-110 of the Criminal Law Article.  On brief, and at argument, the State also suggested that officers could have reasonably suspected that Mr. Sizer was violating a Howard County Ordinance that prohibits possessing an open container, or consuming alcoholic beverages in posted areas.  *See* Howard County, Maryland, Code of Ordinances § 8.700: Consumption and possession of alcoholic beverages in opened containers (2016).  References to laws and ordinances do not provide a particularized basis for suspecting Mr. Sizer of wrongdoing, they only particularize the offense the officers thought might be occurring.

hunch that Mr. Sizer was engaged in criminal activity because he ran at their approach.[9] We do not accord weight to an "inchoate and unparticularized suspicion or 'hunch[.]'" *Terry*, 392 U.S. at 27. Officers may certainly investigate ambiguities, but they must still be able to articulate a particularized basis for suspicion that comports with constitutional standards.

The Majority's analysis is unpersuasive and accords the State too much credit. The Majority claims that Mr. Sizer "overlooks the significance of the officers' decision to investigate based on the improper disposal of the bottle." Maj. Slip Op. at 21. But under the Majority's reasoning, and the State's implied concession, there is no reason to suspect Mr. Sizer was littering without placing unwarranted weight on his flight. The officers never testified that they believed there was a connection between Mr. Sizer's flight and the littering or the alcohol violations. Put simply, he ran, so they chased him.

Although much of the evidence the hearing judge relied on was ambiguous, as the Majority points out, this is not to either the hearing judge's or Mr. Sizer's detriment. The State must demonstrate a sufficient factual basis for the stop. *See Jeremy P.*, 197 Md. at 22. If the hearing judge resolved this issue based on ambiguous evidence, it is because the State failed to satisfy its burden. Any inferences from these ambiguities should be drawn

---

[9] Mr. Sizer's brief suggests that he may have run because he was startled. The officers approached out of darkness, and Officer Baker testified that the group first noticed the officers when they were five feet away from the group. The officers testified that they identified themselves as police during their approach, but they also described the group as "loud." Based on this evidence, it is not unreasonable to draw an inference that Mr. Sizer's flight may have not been entirely unprovoked.

9

in Mr. Sizer's favor because the motion to suppress was granted. *See Longshore*, 399 Md. at 498.

Turning to the question of the use of a hard take-down, the Supreme Court in *Terry* explained that "[t]he manner in which [a] seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all." 392 U.S. at 28. The Supreme Court has held that claims that "law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure'" of an individual must be analyzed under the "objective reasonableness" standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Fourth Amendment permits "some degree of physical coercion or threat thereof" in making an investigatory stop. *Id.* at 396. The "reasonableness" of a seizure depends both on when it occurred and how it is carried out. *See id.* at 395 (citing *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985)).

Whether a seizure is reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *see also Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017). A court must consider "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

Under the totality of the circumstances, the officers' conduct was not reasonable. The officers lacked a particularized basis to suspect Mr. Sizer of criminal activity. There

was no reason to believe that he was a threat to officer safety at the time of the chase and tackle because he stated that he had a gun **during** the tackle.[10]  The officers seized Mr. Sizer **before** they were aware that he armed.  *See California v. Hodari D.*, 499 U.S. 621, 626 (1991).

Maryland permits warrantless arrests for individuals who have committed or attempted to commit a misdemeanor "in the presence of or within the view of the police officer."  Maryland Code (1957, 2008 Repl. Vol.), § 2-202(a) of the Criminal Procedure Article.  If the officer has probable cause to believe that the misdemeanor is being committed in his presence or in his view, he may arrest any person whom the officer **reasonably believes** has committed the crime.  *Id.* § 2-202(b).  Assuming that throwing the bottle was littering, or that someone in the group was consuming alcohol, the officers did not know who committed these offenses.  The officers could not reasonably believe it was Mr. Sizer when they testified that they had not observed **anyone** in particular doing those activities.  *See Parks v. State*, 4 Md. App. 432, 434 (1968) (warrantless arrest for littering was unlawful when officers did not see arrestee littering and there was no evidence of a common criminal design to litter).

Finally, the nature of the suspected offenses does not suggest that a hard take-down was reasonable.  Our prior cases on the use of force in investigatory detentions have dealt

---

[10] There was some dispute during the hearing regarding precisely when Mr. Sizer said "I have a pistol," and whether that statement occurred **before** or **after** Schlossnagle tackled him.  The hearing judge also found that Mr. Sizer made the statement "in the process of Officer Schlossnagle taking him down . . . ."  This factual finding was not clearly erroneous given the speed of events and the ambiguities in timing.  *See Raynor v. State*, 440 Md. 71, 81 (2014).

11

with crimes that presented a threat to public safety, with identified suspects. *See In re David S.*, 367 Md. 523, 539 (2002) (officers saw a suspect with what appeared to be a handgun); *Lee v. State*, 311 Md. 642, 661–67 (1988) (officers detained suspects in an armed robbery who had injured an individual and were believed to be armed); *Cf. Longshore*, 399 Md. at 517. I am reluctant to extend our reasoning in those cases to minor misdemeanor offenses when the officer lacks particularized suspicion that the detained individual is engaged in criminal activity. Under the totality of the circumstances in this case, I conclude that it was unreasonable for the officers to chase and tackle Mr. Sizer.

## ATTENUATION

Although I disagree with the Majority's conclusion that this stop was constitutional, I concur in their alternative holding, that the officer's unlawful conduct was attenuated by the discovery of the arrest warrant.[11] To determine whether attenuation applies, a reviewing court considers three factors first set forth in *Brown v. Illinois*, 422 U.S. 590 (1975); *see also Miles v. State*, 365 Md. 488, 522 (2001). First, we examine the "'temporal proximity' between the unconstitutional conduct and the discovery of the evidence to determine how closely the discovery of evidence followed the unconstitutional search." *Utah v. Strieff*, 136 S. Ct. 2056, 2062 (2016) (quoting *Brown*, 422 U.S. at 603). Second, we examine the intervening circumstances. Third, we "examine 'the purpose and flagrancy of the official misconduct.'" *Id.* (quoting *Brown*, 422 U.S. at 604).

---

[11] I agree with the Majority that the independent source doctrine is not applicable. Because attenuation applies, there is no reason to reach this issue.

12

## Temporal Proximity

The temporal proximity factor weighs against attenuation if there is no "substantial time" between the "unlawful act and when the evidence is obtained." *Id.*; *see also Cox v. State*, 397 Md. 200, 218 (2007). The officers testified that the sequence of events happened very quickly. Mr. Sizer stated that he had a gun as he was being tackled, and the search took place almost immediately after the officers cuffed Mr. Sizer and discovered the warrant. Generally, an unlawful stop and near-contemporaneous discovery of evidence will not be a sufficient lapse in time to "attenuate the taint of a presumptively illegal stop . . . ." *Cox*, 397 Md. at 218. Thus, the temporal proximity factor here favors rejecting attenuation because no substantial time elapsed. *See Strieff*, 136 S. Ct. at 2062; *Cox*, 397 Md. at 218.

## Intervening Circumstances

"[A]n intervening circumstance is an event that breaks the causal connection between the unlawful conduct and the derivative evidence." *Ferguson v. State*, 301 Md. 542, 551 (1984). Even before *Strieff*,[12] we have found that discovery of a valid arrest warrant after an unconstitutional detention is an intervening circumstance that weighs in favor of attenuation. *See Cox*, 397 Md. at 219; *Myers v. State*, 395 Md. 261, 227–28 (2006). The discovery of an arrest warrant that is "wholly independent of the illegal

---

[12] The Supreme Court applied *Segura v. United States*, 468 U.S. 796 (1984) in its reasoning in *Utah v. Strieff*, 136 S. Ct. 2056 (2016). The Court acknowledged that *Segura* applied the independent source doctrine, not attenuation, but concluded that the principle relating to a valid arrest warrant was applicable in attenuation. *Strieff*, 136 S. Ct. at 2062.

stop"[13] breaks the causal chain because the warrant compels the officer to arrest the suspect. *Strieff*, 136 S. Ct. at 2063.

Corporal Zammillo was compelled to arrest Mr. Sizer when he recognized him from prior interactions and knew that he had an open warrant. *See id.* at 2062. Officer Schlossnagle became aware of the gun through Mr. Sizer's statement during an unlawful seizure **before** Zammillo recognized Mr. Sizer and discovered the arrest warrant, however, officers searched the backpack and found the gun **after** the warrant discovery. The question is whether this fact affects the intervening circumstance factor such that it weighs against attenuation.

In *Cox*, after detaining two individuals without reasonable suspicion, the officers learned that Cox had an outstanding warrant for failure to appear in court on drug charges and arrested him. 397 Md. at 205. After the arrest, the officers found marijuana on the ground where Cox had been sitting. *Id.* We concluded that the presence of the warrant favored attenuation because the valid arrest warrant gave officers probable cause to arrest Cox before they found the marijuana. *Id.* at 219.

In *Myers*, an officer initiated a traffic stop and observed a screwdriver in plain view that could make pry marks consistent with those found at some recent burglaries. The officer learned that Myers had outstanding warrants from another jurisdiction and took him into custody. A search incident to arrest revealed further evidence of burglary. 395 Md.

---

[13] In *Taylor v. Alabama*, 457 U.S. 687, 692 (1982), the Supreme Court determined that an arrest warrant filed **after** an unconstitutional arrest did not serve as an intervening circumstance because the officers secured the warrant using information obtained from the illegality.

14

at 268–69. We assumed the stop was invalid, but concluded that the arrest warrant "sufficiently attenuated" the tainted stop such that the exclusionary rule did not apply. *Id.* at 277–78. As the Majority opinion notes, we determined in *Myers* that the timing was not "dispositive" because "there was an outstanding arrest warrant discovered between the initial stop and the subsequent search incident to arrest, even though **some of the evidence** was discovered shortly after the illegal stop." *Id.* at 292 (emphasis added).

Mr. Sizer cites *People v. Maggit*, No. 335651, 2017 WL 2351500 (Mich. Ct. App. May 30, 2017), suggesting that case supports rejecting attenuation here. In *Maggit*, the Michigan Court of Appeals paid careful attention to the timing of the seizure and the discovery of a warrant to determine whether intervening circumstances favored suppression. *Id.* at \*10. The court pointed out that *Strieff* involved a "fact pattern[] of (1) invalid seizure; (2) discovery of a valid arrest warrant; and (3) search and discovery of contraband . . . ." *Id.* The court distinguished *Maggit* based on the difference in the fact pattern: "(1) invalid seizure; (2) search and discovery of contraband; and (3) discovery of a valid arrest warrant." *Id.* The court determined that the warrant in that case was not an intervening act because it "had no effect on the actions taken by the police in this case, nor did it have any effect on the evidence that was recovered from the defendant." *Id.*

Here, the fact pattern diverges from both *Strieff*, *Cox*, and *Maggit*, but is consistent with *Myers*: (1) An invalid seizure and some evidence; (2) discovery of an arrest warrant; and (3) search and discovery of contraband. Like *Myers*, although some evidence was obtained before the discovery of the warrant, the gun was found after the discovery of the warrant and the arrest. Unlike in *Maggit*, the search was incident to a lawful arrest. In

15

*Maggit*, the arrest itself was unlawful, despite the later discovery of a valid warrant. *See* 2017 WL 2351500, at *10. I agree with the Majority that *Myers* sufficiently resolves the issue. The presence of a valid unrelated arrest warrant supports attenuation, even if some evidence is found before the arrest warrant. *See* 395 Md. at 292. I reach this conclusion because there was no substantial lapse in time between the illegality and the intervening circumstance, and the officers had not taken any significant action based on Mr. Sizer's statement, such as searching his bag. Thus, this factor weighs in favor of the State.

### The Purpose and Flagrancy of Police Misconduct

This factor reflects the exclusionary rule's goal of deterring police misconduct by "favoring exclusion only when the police conduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Strieff*, 136 S. Ct. at 2063. Flagrancy requires more severe police misconduct than the mere absence of proper cause for a seizure. *Id.* at 2064; *see also Myers*, 395 Md. at 293 (officer's conduct was not flagrant only because the stop was invalid).

Here, the officers accosted the group after an unknown member of the group made an ill-advised decision to throw a bottle in the parking lot, and the officers suspected that some members of the group might be drinking. Although they lacked suspicion that Mr. Sizer had done anything, it was not unreasonable for the officers to approach the group. There is no evidence in the record of a pattern of systemic police misconduct by the Howard County Police Department. *See Strieff*, 136 S. Ct. at 2063; *Maggit*, 2017 WL 2351500, at *10. While the officers' decision to chase and tackle Mr. Sizer may have been an error in judgment, given the lack of reasonable suspicion that he was engaged in criminal activity,

16

absent further evidence of misconduct, I do not conclude their conduct was purposeful or flagrant. Thus, this factor weighs in favor of the State. The arrest warrant, therefore, sufficiently attenuated the illegality, and the evidence of the gun should have been admitted.[14]

## CONCLUSION

I agree with the Majority that the evidence is admissible because the valid, unrelated arrest warrant sufficiently attenuated the unreasonable seizure. I do not agree, however, with the Majority's conclusion that the seizure of Mr. Sizer was reasonable under the totality of the circumstances. I do not suggest officers should permit individuals suspected of committing crimes to escape. But at a suppression hearing, the State must demonstrate that the officers had a sufficient factual basis to stop a citizen—especially when that stop is a hard take-down. *Grant*, 449 Md. at 30; *Jeremy P.*, 197 Md. App. at 22. They failed to do so. This Court should not shoulder that burden.

Judge Hotten has authorized me to state that she joins this Concurring and Dissenting Opinion.

---

[14] When Mr. Sizer was being processed for detention at Booking, a corrections officer located a bag of pills in Mr. Sizer's sock. Schlossnagle referred to this as a "search incident to detention" as a matter of "protocol." This appears to be an inventory search, which is a well-recognized exception to the Fourth Amendment warrant requirement. *See Illinois v. Lafayette*, 462 U.S. 640, 645–47 (1983).

17